**John R. SHARKEY, Sr., Plaintiff-Appellee,**

v.

**PENN CENTRAL TRANSPORTATION COMPANY, Defendant-Appellant.**

**No. 163, Docket 73–1611.**

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1973.

Decided March 1, 1974.

Mulligan, Circuit Judge, dissented in part.

Jesse C. Sable, New York City (Arnold B. Elkind, New York City, on the brief), for plaintiff-appellee.

John F. Scully, Hartford, Conn. (Cooney, Scully & Dowling, Joseph P. Cooney, David T. Ryan, Hartford, Conn. of counsel), for defendant-appellant.

Before LUMBARD, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from an order of the United States District Court, District of Connecticut, Hon. Robert C. Zampano, Judge, denying the defendant's motion for a new trial. The plaintiff has sued for damages pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60, because of injuries sustained on August 20, 1969, while he was employed as a ticket collector-conductor by the defendant. After a jury trial, a verdict in favor of the plaintiff in the sum of $125,000 was returned on May 16, 1972. In his ruling below on defendant's motion for a new trial, Judge Zampano directed that the jury verdict be set aside and a new trial be granted unless within 15 days the plaintiff filed a remittitur of all sums in excess of $93,750. The plaintiff thereupon filed a consent on March 22, 1973. This appeal by the defendant followed. The judgment of the District Court is hereby reversed and a new trial is ordered.

On August 20, 1969, plaintiff conductor was working on the New York Division of the Penn Central R.R., on train N48 running between New York, Stamford and New Canaan, Connecticut. On the run from Stamford to New Canaan, N48 was scheduled to meet train N49, a nine-car train which was proceeding south from New Canaan. N48 was ordered to pull into the Dale siding just north of Springdale Station to permit N49 to pass. The engineer of N48 was given appropriate orders by the tower operator at Stamford. However, N48 did not pull into the siding but in fact collided head on with train N49 at 8:19 p. m. some 710 feet past the Hoyt Street crossing which is located north of the Dale siding. Four people were killed and 40 people sustained injuries as a result of the collision. The defendant has raised no questions here with respect to its liability.

Plaintiff at the time of the accident was 53 years old and had been employed by the railroad for some 28 years. He was confined to the Stamford Hospital for 25 days following the incident. His final hospital diagnosis was as follows:

(1) Concussion, Multiple Abrasions, and Contusions of Both Legs, Chest, and Abdomen.

(2) Traumatic Myositis, Cervical, Lumbosacral, and Dorsal Spine.

(3) Anxiety Reaction.

The plaintiff suffered no broken bones, and his hospital treatment consisted primarily of bed rest, medication and tranquilizing drugs.

After his discharge from the hospital in February, 1970, the plaintiff reported to a company doctor for an examination in an effort to return to work, but was found to have a left inguinal hernia. This had not been detected in his initial medical examination and the plaintiff submitted to an operation to correct the hernia. In May, 1970, he was certified as fit to return to work, but on May 17, when he actually reported, he was advised that he was being held out of service pending an investigation into his responsibility for the train wreck on August 20, 1969. The plaintiff testified that this news upset him, that it "hit me kind of hard," and there was psychiatric evidence of a "post-traumatic conversion hysteria," sometimes called a post-traumatic anxiety neurosis with conversion symptoms. The plaintiff was provided a hearing by the railroad to determine his responsibility for the accident and he was represented at the hearing by the union. As a result of the hearing, he was discharged. An administrative appeal has apparently been taken from that decision.

I

■■ The principal argument raised on appeal relates to the question of the responsibility of the defendant for the aggravation of the plaintiff's post-traumatic anxiety neurosis by reason of his discharge by the railroad. It seems clear that in an FELA action for damages the plaintiff is not entitled to recover for wages lost solely by reason of his discharge. His appropriate remedy for this monetary loss is an administrative proceeding pursuant to the Railway Labor Act, 45 U.S.C. § 153 First (i). Andrews v. Louisville & N. R. R. Co., 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). In such a proceeding, the National Railroad Adjustment Board (Board) may direct reinstatement as well as lost wages. However, it does not appear to be disputed that any mental distress created by an improper firing is not compensable in the administrative proceeding. Cf. St. Clair v. Teamsters Local 515, 422 F.2d 128, 132 (6th Cir. 1969); Brady v. Trans World Airlines, Inc., 244 F.Supp. 820 (D.Del.1965), aff'd, 401 F.2d 87 (3d Cir. 1968), cert. denied, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969).

■ The court below recognized that the plaintiff could not recover for lost wages, such claim being within the jurisdiction of the Board, and the jury was instructed that this was "not a case involving a breach of contract action for a wrongful discharge of employment." However, the court did permit admission of evidence that the plaintiff had in fact been discharged "to let the jury know why this man did not go back to work." The jury should have been more forcefully instructed that the fact that the plaintiff did not return to work for the railroad was not their concern in this case and that no damages for lost earnings were to be awarded. Having brought the fact of discharge to the attention of the jury during the direct examination of the plaintiff, counsel for the plaintiff on summation not only emphasized his loss of wages, which admittedly was not the concern of the jury, but also went to great lengths to underscore the fact that the railroad had made a scapegoat of a faithful employee of 28 years.[1]

1. For example, in his summation, Sharkey's counsel stated:

You know, when we were children we used to do this little rhyme about sticks and stones, you know, will hurt my bones, and so forth. But this is not true. When your name is besmirched, when you are accused, after faithful service . . . and suddenly, after all of that time, you are disgraced, I do not think there is a way of compensating a person any more. You cannot restore to him his name, you cannot restore to him the respect of his friends and his neighbors and his community, because they made their

It is apparent that the verdict here was unconscionable and reflected a prejudice against the carrier, exacerbated by an intemperate summation which resulted in a punitive verdict. The damages originally awarded totalled $125,000. Plaintiff suffered no broken bones or permanent physical disability as a result of the accident. The final diagnosis of plaintiff's physician, Dr. Moriarty, referred to above, indicates that his physical injuries were not severe. A hernia resulting from the accident was later discovered and corrected without difficulty. Plaintiff's mental condition had substantially improved by the time of trial. Finally, plaintiff was hospitalized for his injuries for less than four weeks. Under the circumstances, the verdict was clearly excessive.[2] While the trial court recognized this, the remittitur was nonetheless totally unrealistic. In fact, it is difficult to understand on what basis it was computed. We are therefore convinced that the judgment here must be reversed and a new trial ordered. Kelly v. New York, N.H. & H. R.R., 138 F.Supp. 82 (D.Mass.1956).

Since the district court will be confronted on retrial with a number of questions now raised by the appellant, we deem it advisable to resolve them on this appeal.

## II

▮▮▮ Appellant claims that it was improper for trial counsel for the plaintiff to indicate to the jury the amount of money which should be awarded for the damages suffered by his client. In FELA cases, the law to be applied concerning the propriety of counsel's argument to the jury is federal law rather than the law of the state. See Eaton v. Long Island R.R., 398 F.2d 738 (2d Cir. 1968); Kodack v. Long Island R.R., 342 F.2d 244, 247 (2d Cir. 1965); Lanni v. Wyer, 219 F.2d 701 (2d Cir. 1955). Chicago, St.P., M. & O. R.R. v. Arnold, 160 F.2d 1002 (8th Cir. 1947). Cf. McDonald v. United Airlines, Inc., 365 F.2d 593 (10th Cir. 1966); Yeargain v. National Dairy Products Corp., 317 F.2d 779 (8th Cir. 1963). We believe that the matter of estimating damages for the guidance of the jury is best left largely to the discretion of the trial judge, and that, if he decides to permit the argument, no error will be committed at least where counsel makes clear that his figures are only suggestions, and the court instructs the jurors that the suggestions are not binding on them. See Waldron v. Hardwick, 406 F.2d 86, 89 (7th Cir. 1969); Baron Tube Co. v. Transport Ins. Co., 365 F.2d 858 (5th Cir. 1966); Rush v. Cargo Ships & Tankers, Inc., 360 F.2d 766, 769 (2d Cir.), cert. denied, 385 U.S. 842, 87 S.Ct. 96, 17 L.Ed.2d 75 (1966). However, the "suggestion" by trial counsel here that the jury could compensate Sharkey for his lost wages until he was 65 years of age was clearly inappropriate and should not be permitted on retrial.

## III

Appellant also argues that the trial court improperly permitted Dr. Lawrence I. Kaplan to testify to the medical history given by Sharkey to this physician some 19 months after the accident. It is urged that Dr. Kaplan was consulted by plaintiff, not for the purpose of receiving treatment, but in order to obtain an opinion which was later to be used in the trial of this case. It is urged that the evidence is hearsay, which, in these circumstances, is particularly unreliable since there exists an incentive to a patient to exaggerate in statements to a physician who is em-

judgment a long time ago when the railroad made theirs.

So now he is asking to be vindicated by you, and your vindication is shown by your verdict, and you do justice in this case by your verdict.

▮▮▮▮

2. It is also to be noted that the jury's original verdict of $125,000 was precisely the sum twice suggested to them by plaintiff's counsel in summation, based on his prognosis of the plaintiff's loss of earnings through age 65.

ployed merely to testify on his behalf. Brown v. Blauvelt, 152 Conn. 272, 205 A.2d 773, 774 (1964).

■ However, it should be noted that the trial judge here made an initial finding that Sharkey had established at least a prima facie foundation that he went to see Dr. Kaplan for medical purposes on advice of Dr. Moriarty, the examining physician. This finding cannot be reversed on appeal if it is fairly supported by the evidence. Gila Valley, G. & N. Ry. v. Hall, 232 U.S. 94, 103, 34 S.Ct. 229, 58 L.Ed. 521 (1914); Steward v. Atlantic Refining Co., 240 F.2d 715, 719 (3d Cir. 1957); Ramming Real Estate Co. v. United States, 122 F.2d 892, 894 (8th Cir. 1941); Morton Butler Timber Co. v. United States, 91 F.2d 884, 886–887 (6th Cir. 1937); Crowell v. Middletown Sav. Bank, 122 Conn. 362, 189 A. 172, 176 (1937); C. McCormick, Evidence § 53, at 121 (2d ed. E. Cleary ed. 1972). Here Sharkey testified that he sought psychiatric assistance at the suggestion of Dr. Moriarty and only obtained approval from his counsel. We therefore deem it appropriate to defer to Judge Zampano's ruling, particularly since he had the opportunity of gauging Sharkey's credibility. See Martin v. Morse Boulger Destructor Co., 256 F.2d 675 (2d Cir. 1958); Mazzella Blasting Mat Co. v. Vitiello, 250 F.2d 935 (2d Cir. 1957) (per curiam); United States v. Aluminum Co. of America, 148 F.2d 416, 433 (2d Cir. 1945). Had Dr. Kaplan been consulted solely because the plaintiff sought to obtain an expert medical opinion for use at trial, he would be precluded from giving the testimony in question. See Fed.R.Civ.P. 43(a); Padgett v. Southern Ry., 396 F. 2d 303, 308 (6th Cir. 1968); Atlantic Coast Line R.R. v. Dixon, 207 F.2d 899, 902 (5th Cir. 1953); Meaney v. United States, 112 F.2d 538 (2d Cir. 1940); Brown v. Blauvelt, *supra*. But this was not the case. ·

## IV

This part of the opinion represents only the views of the author and is thus a dissent on this troublesome aspect of the appeal.

The plaintiff argues that while damages for lost wages as such are not recoverable in this action, the fact of Sharkey's discharge did aggravate the initial anxiety created by the negligence of the defendant and so was a proper matter for the jury to consider in estimating the pain and suffering proximately caused by the defendant's negligence. The defendant urges that, while the discharge may be wrongful, this is not for the jury to consider in an FELA case. Apparently, the only authority in point is Beanland v. Chicago, R.I. & P. R.R., 480 F.2d 109 (8th Cir. 1973), which holds that any mental distress damage relating to the discharge may not be recovered in the FELA action. The only rationale supplied is the comment: "Damages resulting from *intentional* acts, such as the discharge, have no place in a personal injury F.E. L.A. action which deals exclusively with *negligence*." 480 F.2d at 113 (emphasis in original).

This is at odds with the generally applied rule in negligence cases. A person who negligently injures a party is usually responsible for certain kinds of aggravation of the injuries at the hands of third parties. Thus, the original tortfeasor is held responsible if the injury caused by him is aggravated by the negligent acts of a physician who attempts to treat the victim for his injury. Texas & P. Ry. v. Hill, 237 U.S. 208, 35 S. Ct. 575, 59 L.Ed. 918 (1915); Harris v. Brian, 255 F.2d 176 (10th Cir. 1958); Lange v. Hoyt, 114 Conn. 590, 159 A. 575 (1932); Wagner v. Mittendorf, 232 N.Y. 481, 134 N.E. 539 (1922); 2 F. Harper & F. James, The Law of Torts § 20.3, at 1124 (1956). Even if the medical treatment is properly administered, recovery is possible if aggravation occurs. Simmons v. Lollar, 304 F.2d 774 (10th Cir. 1962); Lane v. Southern Ry., 192 N.C. 287, 134 S.E. 855 (1926). The test usually applied is whether or not the cause of the aggravation is a "normal intervening cause," that is, one

which is reasonably foreseeable in the light of ordinary human experience, one which is the natural and probable result of the original wrong, or one which the defendant had reason to anticipate under the particular circumstances. W., Prosser, Torts § 44 (4th Ed. 1971); Restatement (Second) of Torts §§ 447 & 457 (1965). Here it would seem that the carrier could have reasonably foreseen that Sharkey would face a company investigation and that his discharge could be a consequence. The only distinction between this case and those cited above is that here the aggravation was created not by a third party but by the initial tortfeasor. If anything, the distinction would suggest *a fortiori* that damages for the second injury should be granted.

My brothers argue that if the Board should sustain Sharkey's discharge, it follows that he was properly removed from service and that the damages for the aggravation of the psychic injury now sought were due to his own fault. He should not be compensated for what amounted to a self-inflicted injury. It is, in effect, *damnum absque injuria*. The flaw in this argument is, I believe, that the body to determine the damages for the foreseeable consequences of the carrier's tort is the jury in the FELA action and not the Board. The Board's only function is to determine whether or not Sharkey was properly dismissed, and, if he was, its sanction is to deny him reinstatement and a recovery for lost wages. Sharkey presumably could be discharged if he violated a safety rule or regulation, even though he was not primarily liable for the collision. This might well be justified in view of the carrier's obligation to provide the public with safe transport. However, in the FELA action the rule of comparative negligence applies (45 U.S.C. § 53), and Sharkey therefore is entitled to recover for his injuries, even though he might be partially at fault.

He concededly cannot recover for lost wages, however, since that determination rests upon considerations not before the jury, but is entrusted to the carrier and the Board, which cannot award him any recovery for mental distress even if his discharge was unwarranted under any criterion. In my view, therefore, if the jury on retrial should find that the carrier was primarily responsible for the collision and thus that Sharkey is entitled to recover for his injuries arising therefrom, I would permit him to recover for the aggravation of the psychic injury he suffered from the firing, just as he recovers for all his other traumae. He has no other place to go.

Reversed and remanded for retrial in accordance with the views of the majority of this panel.

MANSFIELD, Circuit Judge:

██ I concur in Parts I, II and III of Judge Mulligan's thorough and thoughtful opinion. However, in my view Sharkey, if found to have been properly discharged for cause, would not be entitled to an award of damages for the aggravating effect of the discharge upon his mental condition. Assuming the jury upon retrial found that the discharge and its aggravating effect was reasonably foreseeable—and this issue would first have to be resolved—I fail to perceive any logical basis for permitting recovery for its aggravating effect unless the discharge was improper and not the result of wrongful conduct on Sharkey's part. The final determination of the propriety of the discharge rests with the Railroad Retirement Board.

██ Should the Board find that the discharge was proper and for good cause, to permit recovery for its aggravating effect would be no different than to allow a plaintiff to recover for a self-inflicted injury which he could have avoided by acting lawfully and reasonably, or by observing his own duty to mitigate. Ordinarily a plaintiff is pre-

cluded from recovering for consequential harm caused by his own negligent conduct. S. S. Kresge Co. v. Kenney, 66 App.D.C. 274, 86 F.2d 651 (1936); Matter of Sullivan v. B & A Constr., Inc., 307 N.Y. 161, 120 N.E.2d 694 (1954); Yarbrough v. Polar Ice & Fuel Co., 118 Ind.App. 321, 79 N.E.2d 422 (1948). See generally, Vance, Liability for Subsequent Injuries, 42 Tex.L.Rev. 86 (1963). Absent proof that the circumstances giving rise to Sharkey's discharge were not within his control or not attributable to his own fault or misconduct, the defendant should not be held liable for the proximate results of plaintiff's own independent misconduct. To guard against such a possibility I would defer retrial until the Board had ruled upon the propriety of the discharge and, if the discharge is upheld, preclude any recovery for its aggravating effect.

The effect of treating a proper discharge as a "normal intervening cause" is to erode the strong public policy in favor of safe operation of railroads by competent personnel, which is reflected in the strict standards to which public carriers are held. A railroad faced with liability for a proper discharge for cause would be discouraged from acting, even though retention of the employee might endanger the public. Assuming, as does our brother Judge Mulligan, that the railroad here was primarily negligent and that it discharged Sharkey because his misconduct or negligence was secondarily the cause of the accident, the railroad's right to discharge him for cause should not be inhibited by a wooden-like application of the doctrine of comparative negligence to hold it liable for aggravation caused by the discharge. In the conflict between the policy in favor of comparative negligence and that in favor of safe operation of public carriers, the latter should prevail.

LUMBARD, Circuit Judge:

I concur in Judge Mansfield's opinion.