Gary C. **LANCASTER**,
Plaintiff-Appellee,

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant-Appellant.**

No. 84–2768.

United States Court of Appeals,
Seventh Circuit.

Argued May 28, 1985.

Decided Sept. 16, 1985.

As Amended Sept. 17, 1985.

Rehearing and Rehearing En Banc Denied Nov. 18, 1985.

8. *See id.* at 201.

James P. Baker, Law Office of James P. Baker, Springfield, Ill., for defendant-appellant.

Ronald L. Carpel, Coral Gables, Fla., Frank H. Byers, Byers, Byers & Greenleaf, Decatur, Ill., for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal by the Norfolk and Western from a judgment for $850,000 in a suit under the Federal Employers' Liability Act (45 U.S.C. §§ 51–60) by a former employee of the railroad, Gary Lancaster, presents issues of labor and tort law in a bizarre factual setting.

The jury could have found the following facts in favor of Lancaster. In 1975 he was a 30-year-old mechanic working in the railroad's locomotive shop in Decatur, Illinois. Lachrone, a short-tempered foreman in the shop who had once been disciplined for roughing up a worker, became angry at Lancaster and several other workers who Lachrone thought were soldiering on the job. After flipping over a table on which one of the workers (not Lancaster) was sleeping, and smashing a bench, Lachrone grabbed a broom handle, approached Lancaster in a menacing fashion, screamed at him for about 15 seconds, and shook the broomstick in his face. Lancaster bid out from Lachrone's supervision and complained about the incident to his union, but no action was taken.

The incident upset Lancaster abnormally. He thought people were following him, thought his phone was tapped, felt that the pressures of working for the railroad were too much, and went to Georgia to look for a new job. But after a couple of months his distress subsided and he went back to the old one. He was assigned to another foreman, Funderburk, who liked to "goose" workers, pull their hair, and hit them on the arms. He did these things to Lancaster, over the latter's protest. This behavior culminated in an incident in 1976 when Funderburk twice stuck his hand down the back of Lancaster's pants—once squeezing a buttock, the other time sticking his finger into Lancaster's anus. Lancaster became very upset, had trouble working, consulted a doctor, and on the doctor's advice took a leave of absence. The doctor diagnosed Lancaster as suffering from anxiety but it is unclear whether he told Lancaster his diagnosis.

Lancaster returned to work early in 1977 and worked uneventfully until an incident in 1979 involving another supervisor, Boyd. Lancaster and another worker were repairing a locomotive under Boyd's supervision when Boyd picked up a sledgehammer—though as a supervisor he was not supposed to wield a sledgehammer—and swung it at a pin that was stuck. The sledgehammer flew out of Boyd's hands when he completed his swing, and struck Lancaster. Although only bruised, Lancaster became very upset because he thought Boyd had thrown the sledgehammer at him ("I swear before God the man throwed that sledgehammer, because when he throwed it, it went right where my head was back, and when I moved back is the only thing that saved my life").

Two months later Lancaster found himself working under another hot-tempered supervisor, like Lachrone—Tynan, a burly six-footer, who while fondling a pickax handle told Lancaster that if he didn't "keep on the job and do it right, I'll put your name on it." About a week later Lancaster happened to deliver some papers to Tynan that were folded. Tynan said, "I told you not to fold the papers," to which Lancaster replied that he had not folded them, they had been folded when he had received them to give to Tynan. Tynan, enraged, charged Lancaster with pickax handle in hand ("I turned around, and here's Jack [Tynan] coming at me, and I says, don't Jack, don't") and struck the door frame over Lancaster's head with the handle ("I heard his pickax handle hit the door frame, and I turned around, and there's Jack, and he wasn't smiling"). Lancaster became even more upset than after the previous incidents. Indeed his mental condition deteriorated rapidly. His doctor referred him to a psychiatrist who, two weeks after the incident with Tynan, diagnosed Lancaster as schizophrenic. Lancaster quit work, tried unsuccessfully to return, and is expected never to be well enough to work again.

A psychologist who testified for the railroad opined that Lancaster's latent schizophrenia would surely have been triggered by some other traumatic event if no supervisor misconduct had occurred. The two psychiatrists who testified for Lancaster thought this unlikely, among other reasons because Lancaster had got through two divorces before 1970 without incident. They thought that Lancaster's sense of self-worth was bound up with his work for the railroad and that his supervisors' hos-

tile acts had exerted unbearable psychological pressure on him. All three expert witnesses agreed that the incident with Tynan, coming on top of the earlier incidents, had precipitated a descent into madness from which Lancaster will never recover.

Surprisingly, the railroad does not dispute the reasonableness of the damage award (which is made up of $40,000 in medical expenses, $200,000 in past and future pain and suffering, and $610,000 in lost earnings), although it does challenge one of the instructions on damages. Before getting to that, however, we shall consider the three grounds on which the railroad asks that the suit be dismissed: that the cause of action is barred by federal labor law; that the supervisors' misconduct was outside of the scope of their employment, so that the railroad is not liable for that misconduct under the doctrine of respondeat superior; and that the statute of limitations has run. The railroad's challenge to the instruction on respondeat superior (as distinct from the factual basis for a finding of liability on a theory of respondeat superior) has no possible merit and therefore need not be discussed.

■ The railroad's first ground requires us to consider the effect, if any, of the Railway Labor Act on the plaintiff's rights under the Federal Employers' Liability Act. Originally enacted in 1906, the FELA creates a tort remedy for railroad workers injured on the job. Many years later Congress passed the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, which subjects disputes arising under collective bargaining agreements in the railroad industry (and, with some alterations, now in the airline industry as well, see 45 U.S.C. §§ 181–88) to compulsory arbitration. See, e.g., *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R.*, 353 U.S. 30, 34–35, 77 S.Ct. 635, 637–638, 1 L.Ed.2d 622 (1957); *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry.*, 768 F.2d 914 (7th Cir.1985). If Lancaster's dispute with the Norfolk and Western is a dispute over the meaning or application of the collective bargaining agreement—a "grievance," in the jargon of labor relations—then he has a remedy under the Railway Labor Act (or rather had one, because the time limits on prosecuting a grievance under the railroad's collective bargaining agreement with Lancaster's union—limits that are usually stated in days—have surely run out by now). That remedy is to file a grievance against the railroad, the first stage in invoking the arbitral remedies provided by the Act. Lancaster's only judicial remedy under the Act, however, should he lose the arbitration, would be the extremely limited judicial review—a misnomer perhaps, see *id.*, at 921—that the Railway Labor Act allows of arbitration awards.

■ Does that Act displace the Federal Employers' Liability Act for all harms arising from conduct that might violate a collective bargaining agreement (in an industry subject to the Act) and might thus be arbitrable? There is a mountain of cases dealing with the preemption of state tort remedies by the Railway Labor Act, but oddly enough we have found only one case dealing with the Act's displacement of tort remedies under the FELA (the *Yawn* case, discussed below), even though the FELA preempts state law within its domain, *Janelle v. Seaboard Coast Line R.R.*, 524 F.2d 1259, 1261 (5th Cir.1975), so that a railroad worker who has a cause of action under the FELA cannot sue under state tort law instead. As an original matter one might have ascribed the absence of such cases to the fact that the FELA as it is written creates liability only for negligence, see 45 U.S.C. § 51, and most of the tort cases brought by railroad workers in which a defense based on the Railway Labor Act is raised have charged wrongful discharge or intentional infliction of emotional distress, which are both intentional torts. Yet the FELA has been interpreted to reach at least some intentional torts. See, e.g., *Jamison v. Encarnacion*, 281 U.S. 635, 641, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930); *Civil v. Waterman S.S. Corp.*, 217 F.2d 94, 98 (2d Cir.1954); *Besta v. Consolidated Rail Corp.*, 580 F.Supp. 869 (S.D.N.Y.

1984). Although *Civil* was a case under the Jones Act, which is a statute for the protection of seamen and other maritime workers, rather than under the FELA, the Jones Act incorporates by reference the FELA's standard of liability. See 46 U.S.C. § 688(a).

Granted, interpreting the FELA to reach intentional torts does some violence to the structure as well as the language of the statute. The statute's main purpose was to eliminate a number of traditional defenses to tort liability: contributory negligence, contractual waiver of liability, the fellow-servant rule, assumption of risk. See 45 U.S.C. §§ 51, 53–55; H.R.Rep. No. 1386, 60th Cong., 1st Sess. (1908); S.Rep. No. 460, 60th Cong., 1st Sess. (1908); S.Rep. No. 661, 76th Cong., 1st Sess. (1939). All are defenses to negligence, not intentional wrongdoing. Nevertheless the applicability of the FELA to (at least some) intentional torts is too well settled to be questioned any longer.

■ The reason why the question whether the Railway Labor Act supplants any part of the Federal Employers' Liability Act tends not to arise may be the following: the FELA does not create a cause of action for tortious harms brought about by acts that lack any physical contact or threat of physical contact—an act such as telling a man he's fired, which is precisely the type of act for which the Railway Labor Act provides a swift and adequate remedy. See *Beanland v. Chicago, Rock Island & Pac. R.R.*, 480 F.2d 109, 113 (8th Cir.1973); *Fullerton v. Monongahela Connecting R.R.*, 242 F.Supp. 622, 626 (W.D. Pa.1965), and the *Forgione* line of cases, discussed below; and cf. *Fox v. Consolidated Rail Corp.*, 739 F.2d 929, 931–32 (3d Cir.1984); *Sharkey v. Penn Central Transport Co.*, 493 F.2d 685, 688 (2d Cir. 1974). Although *Yawn v. Southern Ry.*, 591 F.2d 312 (5th Cir.1979), points the other way, we find its analysis unpersuasive. Clerical employees claimed to have suffered physical and mental strain because the railroad had not given them enough help for them to be able to do their jobs adequately. In holding that the railroad's conduct might be actionable under the FELA, the court pointed out correctly that a railroad worker who incurs physical or mental injury from unsafe working conditions has an FELA claim. See 591 F.2d at 317. But the complaint was not that working conditions were unsafe; it was that clerical employees had been given too much—not too dangerous—work to do. That is not our idea of an FELA claim; it has nothing to do with the security of the person from physical invasions or menaces.

In any event, we can find no intentional tort cases under the FELA where the physical dimension was lacking. See Annot., *Liability Under Federal Employers' Liability Act for Intentional Tort*, 8 A.L.R.3d 442 (1966). (*Yawn* did not involve an intentional tort.) It is true that *Slaughter v. Atlantic Coast Line R.R.*, 302 F.2d 912 (D.C.Cir.1962), allowed a suit under the FELA for false arrest. But limiting a person's freedom of movement by arrest or imprisonment is a form of physical interference, and firing a person is not. Moreover, *Forgione v. United States*, 202 F.2d 249, 252 and n. 5 (3d Cir.1953) (per curiam), holds, contrary to *Slaughter*, that false arrest and false imprisonment are not actionable under the Jones Act, and the only other FELA decisions we have found follow *Forgione* rather than *Slaughter*. See *McSorley v. Consolidated Rail Corp.*, 581 F.Supp. 642, 644–45 (S.D.N.Y.1984); *Brady v. Penn Central Transport. Co.*, 406 F.Supp. 1239, 1241 (S.D.N.Y.1975).

Although the question of where to draw the line between the Railway Labor Act and the Federal Employers' Liability Act is distinct from that of the scope of preemption of state tort law by the Railway Labor Act, the two questions should be decided consistently. They involve the same underlying issue: whether the defendant's misconduct, although tortious, is the sort of conduct that Congress, if it had thought about the matter, would have wanted to channel through the grievance machinery set up by the Railway Labor Act; or instead the sort of conduct that Congress

would have wanted to leave, concurrently or exclusively, to state or federal tort remedies. The FELA plaintiff has the option of bringing his suit in state court, 45 U.S.C. § 56, and if he does the defendant cannot remove it to federal court, 28 U.S.C. § 1445(a). For this and other reasons the line between a tort suit under the FELA and a tort suit under state law is not in practice a sharp one, with two exceptions: (1) the FELA eliminates certain defenses that defendants might still have under the laws of some (but a decreasing number) of states; (2) the FELA has been judicially interpreted as we shall see to allow a plaintiff to prevail with minimal proof of negligence.

■ Unfortunately the line between a tort actionable in court and an employment dispute actionable only in a grievance and arbitration proceeding is also not sharp, except in the extreme cases, and let us begin with them. Suppose that supervisor Boyd accidentally dropped a brick on Lancaster's foot and broke it. Lancaster unquestionably could bring a tort suit under the FELA against the Norfolk and Western for the resulting injury and it would make no difference whether the injury was purely physical or included a mental element as well; the defendant's conduct that gave rise to the injury would involve an unauthorized touching of Lancaster's person and would thus be within the bounds of the statute. And there would be no possible issue of the meaning or application of the collective bargaining agreement between the railroad and Lancaster's union, hence no reason to insist that he invoke the arbitral remedies of the Railway Labor Act.

■ The business of arbitrators, commercial or labor, is to interpret contracts. See, e.g., *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *Ethyl Corp. v. United Steelworkers*, 768 F.2d 180, 184–87 (7th Cir.1985); *Jones Dairy Farm v. Local No. P–1236, United Food Workers*, 760 F.2d 173 (7th Cir.1985). This is as true of arbitration under the Railway Labor Act as under the

Taft-Hartley Act or the United States Arbitration Act. See, e.g., *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry., supra*, 768 F.2d at 921. Granted, the Railway Labor Act defines the arbitrators' domain as employment disputes "growing out of grievances *or* out of the interpretation or application of [collective bargaining] agreements," 45 U.S.C. § 153 First (i) (emphasis added), which seems to say that more than contract interpretation is covered. But this language is merely redundant. A "grievance" is a claim of violation of the collective bargaining agreement. Congress had no intention of making a grievance a separate basis for arbitration from disputes over the interpretation or application of the collective bargaining contract. It is true that a dictum in *Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945) (on rehearing, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946)), distinguishes between grievances and contract disputes and gives as an example of claims that are founded on "an omitted case" (i.e., omitted from the collective bargaining agreement), and hence are grievances, "claims on account of personal injuries." But later cases make clear that a grievance is a dispute over rights created by the collective bargaining agreement. See, e.g., *Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., supra*, 353 U.S. at 33, 77 S.Ct. at 636; *Chicago & Northwestern Transport. Co. v. United Transportation Union*, 656 F.2d 274, 278 (7th Cir.1981); *Atchison, Topeka & Santa Fe Ry. v. United Transportation Union*, 734 F.2d 317, 321 (7th Cir.1984); *Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045, 1059 (7th Cir.1983) (dissenting opinion). The Supreme Court has not repeated the dictum of the *Burley* case. If that dictum were an accurate statement of the law, the Railway Labor Act would have repealed the FELA, and all personal injury claims by railroad workers against their employers would be within the exclusive jurisdiction of the arbitration tribunals set up under the Railway Labor Act—something no one believes.

At the other extreme, suppose Lancaster·were claiming that he had not been paid the wage fixed in the collective bargaining agreement. This would be an issue of contract interpretation, hence one for the arbitrators. It would not matter that Lancaster described the underpayment as conversion or some other tort; Congress would have wanted the dispute resolved by the arbitrators and not by a state or federal court. See, e.g., *Peterson v. Air Line Pilots Ass'n,* 759 F.2d 1161, 1168–69 (4th Cir.1985). But now recurs our earlier point about the scope of the Federal Employers' Liability Act. It would not be necessary in the case we just put to construe the intent of the framers of the Railway Labor Act with regard to the previously enacted Federal Employers' Liability Act. It would be enough to note that there was no possible conflict between the statutes, because the FELA does not reach torts which work their harm through nonphysical means; the only torts it provides a remedy for happen not to come within the scope of the Railway Labor Act.

The difficult cases of preemption involve what we may term "nonphysical" torts. More and more states allow suits for wrongful discharge when a worker is fired for a reason that is contrary to public policy (such as giving testimony against his employer), and for intentional infliction of emotional distress even when the act that caused the distress was firing the plaintiff. Invariably courts asked to decide whether either type of suit is preempted by the Railway Labor Act hold that it is. See, e.g., *Jackson v. Consolidated Rail Corp.,* 717 F.2d 1045, 1048–55 (7th Cir.1983); *Minehart v. Louisville & Nashville R.R.,* 731 F.2d 342 (6th Cir.1984) (per curiam); *Beers v. Southern Pac. Transport. Co.,* 703 F.2d 425, 428–29 (9th Cir.1983). The courts see such suits, rightly or wrongly, as end runs around the Railway Labor Act's policy of channeling employment disputes to arbitration. But the courts do not state the issue as one of supersession by the Railway Labor Act of the Federal Employers' Liability Act, because no court (probably not even the court in *Yawn,*

which apparently conceived the case before it as a simple negligence case about improper working conditions) has thought that any of these new torts arise under the FELA. Even firing a worker in retaliation for bringing an FELA suit against his employer does not violate the FELA. See *Jackson v. Consolidated Rail Corp., supra,* 717 F.2d at 1050–51; *Greenwood v. Atchison, Topeka & Santa Fe Ry.,* 129 F.Supp. 105, 107 (S.D.Cal.1955); see also *Loucks v. Star City Glass Co.,* 551 F.2d 745, 749 (7th Cir.1977); *Graf v. Elgin, Joliet & Eastern Ry.,* 697 F.2d 771, 775 (7th Cir.1983). If it violates anything, it violates state law.

Our analysis suggests, therefore, that the critical question in this case is simply whether Lancaster has stated a claim under the FELA, which means a claim for violation of one of the traditional "physical" torts, such as assault, battery, and negligent infliction of personal injury, all of which are torts actionable under the Federal Employers' Liability Act. If he has, there is unlikely to be a problem of supersession or partial repeal by the Railway Labor Act.

The incidents that culminated in the pick-ax-handle episode which precipitated Lancaster's psychosis were assault (Lachrone), battery (Funderburk), battery or negligent infliction of personal injury (Boyd), and assault (Tynan). All are conventional torts involving offensive physical contact or, in the case of assault, placing the victim in apprehension of an imminent such contact. True, two of these incidents, the assaults by Lachrone and Tynan—Tynan's assault being the critical incident in the case— arose from an employment dispute, for these supervisors were expressing their dissatisfaction with Lancaster's performance of his job. It might seem, therefore, that at least with respect to these incidents the Railway Labor Act would require a reference to arbitration. Lancaster did complain to his union about the first incident, and though no grievance was pressed, one could have been. The other incidents could also have been grieved: not

only the last one, involving Tynan, but the two that seem to have been unrelated to Lancaster's performance of his job. Supervisory misconduct, however motivated, is bound to violate the collective bargaining agreement. So maybe there were remedies under the Act for all the incidents, and maybe those remedies were exclusive.

■ But as to the latter question, we think not. Arbitrators have no particular competence to determine causality and assess damages in cases of serious personal injury, whether physical or mental. And as no contention is or could be made that inadequate performance would justify an assault on Lancaster (as a matter of fact his performance was adequate, but that is irrelevant), there would be no occasion in proceedings arising out of the incidents to address the merits of the employment dispute that precipitated them and hence no issue of interpretation of the collective bargaining contract—thus making it even clearer that arbitration would have no advantage over adjudication in this case. The collective bargaining contract was not even placed in evidence. The employment context is wholly incidental.

■ This case is even stronger for the plaintiff than *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). *Farmer* held that the National Labor Relations Act did not preempt a suit under state tort law by a union official who alleged that the union had subjected him to a campaign of threats, personal abuse, and harassment amounting to intentional infliction of emotional distress. Even though a dispute arises out of a labor dispute and could be made the subject of an unfair labor practice complaint to the National Labor Relations Board, state tort remedies survive provided "that the state tort be either unrelated to employment discrimination [which would have been the unfair labor practice in that case] or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." *Id.* at 305, 97 S.Ct. at 1066 (footnote omitted). Here the labor dispute is even further in the background; Lancaster was not a union activist or official. We cannot see how allowing the suit to go forward could interfere with the objectives of the Railway Labor Act.

■ The Norfolk and Western argues that the Railway Labor Act has even more preemptive or displacing force than the National Labor Relations Act, and hence that *Farmer* is not necessarily controlling. Some cases do say that the Railway Labor Act occupies the field of labor relations in its domain even more completely than the National Labor Relations Act does in its, as shown by the fact that only the former Act requires that employment disputes be arbitrated. See, e.g., *Jackson v. Consolidated Rail Corp., supra*, 717 F.2d at 1052; *Peterson v. Air Line Pilots Ass'n, Int'l, supra*, 759 F.2d at 1169 and n. 28. But when courts compare the preemptive scope of the two statutes in this way they have in mind the provisions of the NLRA that date back to the Wagner Act and create a regulatory scheme administered by the National Labor Relations Board; they are not referring to the entire NLRA, which includes amendments added by the Taft-Hartley Act in 1947 (and by later statutes), notably section 301 of the Taft-Hartley Act, 29 U.S.C. § 185. Section 301, which is just as much a part of the edifice created by the (amended) National Labor Relations Act as the parts of the Act enforced by the Labor Board, creates an exclusive federal remedy, judicially rather than administratively enforceable, for breaches of collective bargaining contracts. Where, as is true of more than 90 percent of such contracts, the contract establishes a grievance and arbitration remedy, that remedy becomes by force of section 301 exclusive, just like the arbitral remedies established by the Railway Labor Act. See, e.g., *Allis-Chalmers Corp. v. Lueck*, — U.S. —, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). It is therefore hard to see why that Act should have more preemptive

force than the National Labor Relations Act. In any event if you read the preemption cases under the Railway Labor Act carefully you will see that none of them is inconsistent with *Farmer*, in all, the elements of outrage are—unlike *Farmer*, or even more clearly this case—incidental to the employment dispute rather than vice versa. See, e.g., *Beers v. Southern Pac. Transport. Co., supra*, 703 F.2d at 426. In none of the cases, moreover, does it appear that the plaintiff had sustained a serious physical or psychiatric injury, for which the remedies (reinstatement, back pay, vacation pay, etc.) normally imposed by arbitrators would be inadequate.

■■■ This completes our discussion of the alleged supersession of the Federal Employers' Liability Act by the Railway Labor Act and we move on to the railroad's next contention, which is that the misconduct of the four supervisors, being intentional, cannot be imputed to the railroad by the doctrine of respondeat superior. To evaluate this argument one must understand the problematic status of the doctrine under the Federal Employers' Liability Act. In an ordinary tort case involving an employee's intentional misconduct, the plaintiff sues the employer for the employee's tort and can recover damages on a theory of respondeat superior if he can show that the employee committed the tort in the course of his employment. Under most definitions of "course of employment" the plaintiff must show that the employee's tort was in attempted (though often misguided) furtherance of the employer's business, as where the employee assaults the plaintiff to collect a debt owed the employer. See Prosser and Keeton on the Law of Torts § 70, at pp. 505–06 (5th ed. 1984). This definition has been adopted in a number of FELA (or—the same thing so far as the standard of liability is concerned—Jones Act) cases. See, e.g., *Lambert v. Morania Oil Tanker Corp.*, 677 F.2d 245 (2d Cir.1982); *Copeland v. St. Louis-San Francisco Ry.*, 291 F.2d 119, 121 (10th Cir.1961); *Hoyt v. Thompson*, 174 F.2d 284, 285 (7th Cir.1949) (per curiam). Although *Ira S. Bushey & Sons, Inc. v. Unit-*

*ed States*, 398 F.2d 167, 170–72 (2d Cir. 1968) (Friendly, J.), rejects the definition, *Bushey* was not an FELA or Jones Act case. See generally Note, *Respondeat Superior and the Intentional Tort: A Short Discourse on How to Make Assault and Battery a Part of the Job*, 45 U.Cin.L.Rev. 235 (1976).

The peculiarity of the Federal Employers' Liability Act is that it makes the carrier liable for "the negligence of any of the officers, agents, or employees of such carrier," 45 U.S.C. § 51, and there is no suggestion (though it may well be implicit) of any limitation to acts by these persons in furtherance of the carrier's business. If "negligence" in section 51 also means "intentional misconduct," then it can be argued that the carrier is liable for the intentional misconduct of its employees without regard to traditional limitations on respondeat superior. This reasoning, however, is mechanical, would impart a quite unintended twist to a statute whose begetters were not thinking about intentional torts, and, most important, rests on a misunderstanding of the purpose behind the choice of words in section 51. The purpose was to abolish the fellow-servant rule and thus make the railroad liable for the negligence of its employees as well as for "its own" negligence in failing to provide adequate safety appliances and safe working conditions. See H.R.Rep. No. 1386, *supra*, at 1. The idea that section 51 makes the railroad liable for the intentional torts of its employees outside of the scope of their employment was therefore quite properly rejected in the *Copeland* case, cited earlier, though over a vigorous dissent, compare 291 F.2d at 121–22 with *id.* at 122–24 (dissenting opinion), which persuaded the Sixth Circuit in *Baker v. Baltimore & Ohio R.R.*, 502 F.2d 638, 641–42 (6th Cir.1974). Neither decision, however, considered the purpose of the statutory language that makes the railroad liable for the negligence of its employees. As we have said, the purpose was not to broaden the doctrine of respondeat superior, least of all in intentional tort cases; it was to eliminate the fellow-serv-

ant rule. Consistently with *Copeland,* most cases (such as the *Jamison* and *Slaughter* cases cited earlier) assume that the employer's liability for his employee's intentional torts is to be determined in FELA cases by the usual principles of respondeat superior. See also *Brooks v. Washington Terminal Co.,* 593 F.2d 1285, 1288 (D.C.Cir.1979); *Sowards v. Chesapeake & Ohio Ry.,* 580 F.2d 713, 715 (4th Cir.1978) (per curiam).

A challenge of an opposite kind—urging not that respondeat superior is too restrictive in FELA cases but that the employer cannot be liable under the FELA unless directly at fault—can be mounted from language in several cases that, read literally, makes the employer liable for an employee's tort only if the employer was negligent in hiring, supervising, or failing to fire the intentional wrongdoer. See, e.g., *Harrison v. Missouri Pac. R.R.,* 372 U.S. 248, 249, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963) (per curiam) (" 'reasonable foreseeability of harm is an essential ingredient of Federal Employers' Liability Act negligence,' " quoting *Gallick v. Baltimore & Ohio R.R.,* 372 U.S. 108, 117, 83 S.Ct. 659, 665, 9 L.Ed.2d 618 (1963)); *Green v. River Terminal Ry.,* 763 F.2d 805, 808–09 (6th Cir.1985) (same quotation). Such "direct negligence" by the employer—negligent hiring or retention of an incompetent employee—is a traditional basis for making an employer liable for his employee's tort (see Prosser and Keeton, *supra,* § 33, at p. 203 and n. 1) and a basis that is independent of respondeat superior. But surely the cases we have cited do not really intend to make it the only basis. See, e.g., *Brooks v. Washington Terminal Co., supra,* 593 F.2d at 1288; *Sowards v. Chesapeake & Ohio Ry., supra,* 580 F.2d at 715. Otherwise the plaintiff in an FELA case would have fewer rights than an ordinary tort plaintiff, an unacceptable result once the statutory reference to negligence is understood to embrace intentional misconduct. In neither *Harrison* nor *Green,* moreover, could the plaintiff have won on the basis of respondeat superior, for in neither case was there a plausible argument that the employee-assailant was act-

ing for the employer. Cf. *Palmer v. Apex Marine Corp.,* 510 F.Supp. 72, 74 (W.D. Wash.1981). The plaintiff had to prove negligence by the employer and it was in this context that the courts said that proof of negligence is essential in an FELA case.

We conclude—and it is as far as we need go to decide this case—that an FELA plaintiff may prevail in an intentional tort case by showing either that the intentional tort was committed in furtherance of the employer's objectives or that the employer was negligent in hiring, supervising, or failing to fire the employee. Under the second branch of liability, the principle that limits the employer's liability to torts committed in furtherance of his business drops out. *Brooks v. Washington Terminal Co., supra,* 593 F.2d at 1288; *Slaughter v. Atlantic Coast Line R.R., supra,* 302 F.2d at 916 n. 7 (dictum). There is, it is true, a contrary intimation in Justice Holmes's opinion for the Supreme Court in *Davis v. Green,* 260 U.S. 349, 351–52, 43 S.Ct. 123, 124, 67 L.Ed. 299 (1922): "The ground on which the railroad company was held was that it had negligently employed a dangerous man, with notice of his characteristics, and that the killing occurred in the course of the engineer's employment. But neither allegations nor proof present the killing as done to further the master's business, or as anything but a wanton and wilful act, done to satisfy the temper or spite of the engineer. Whatever may be the law of Mississippi, a railroad company is not liable for such an act under the statutes of the United States." This appears to be a dictum. The Mississippi Supreme Court, so far as one can tell from a rather murky opinion, had decided the case on a theory not of direct negligence but of respondeat superior, treating the employer's knowledge of the vicious disposition of the tortfeasing employee as merely a factor in aggravation of the employer's liability, see *Hines v. Green,* 125 Miss. 476, 493–97, 87 So. 649, 651–52 (1921); and Justice Holmes's opinion goes on to hold that the railroad was not liable under respondeat superior, pre-

cisely because the employee was not acting in furtherance of his employer's business, see 260 U.S. at 352, 43 S.Ct. at 124, a matter on which Justice Holmes disagreed with the Mississippi Supreme Court's findings that the employee "was acting within the scope of his employment and with a view to his master's business," and that "it was no private quarrel, but was a quarrel about the master's business," 125 Miss. at 494, 87 So. at 651.

With a speed unusual even for Justice Holmes, the opinion in *Davis* was issued only six days after the case had been argued, and it seems that the great man tripped in his haste, offering a casual and incorrect observation about direct negligence in a case about respondeat superior. In an opinion he wrote five years later, Justice Holmes described *Davis* as a case about respondeat superior, and implied that direct negligence could be established even if the employee's act was not in furtherance of the employer's business. See *Atlantic Coast Line R.R. v. Southwell*, 275 U.S. 64, 48 S.Ct. 25, 72 L.Ed. 157 (1927). None of the Supreme Court's subsequent opinions in direct-negligence cases, such as *Harrison v. Missouri Pac. R.R.*, *supra*, suggest that there must be proof that the employee's act was done in furtherance of the employer's business, and as noted earlier the facts in *Harrison* refuted any inference that it had been. Although a few lower-court decisions have held that liability in direct negligence does require such proof, see, e.g., *Sheaf v. Minneapolis, St. P. & S.S.M.R. Co.*, 162 F.2d 110, 113 (8th Cir.1947), none is recent; and cases to the contrary are more numerous and better reasoned. Besides *Brooks* and *Slaughter*, see. e.g., *Tatham v. Wabash R. Co.*, 412 Ill. 568, 107 N.E.2d 735 (1952) (Schaefer, J.); *Sowards v. Chesapeake & O. Ry.*, *supra*, 580 F.2d at 715.

There would be no point in having a doctrine of direct negligence if it differed from respondeat superior only in requiring that the plaintiff prove the defendant's negligence; it would never be invoked. And although one might be able to mount an attack on the direct-negligence doctrine

from first principles, noting that it casts on the employer the unusual duty (in common law thinking) of having to protect its employees against violence emanating from persons who are not (at the time) engaged on the employer's business, no such attack is attempted in this case. It comes in any event much too late in the evolution of the case law under the Federal Employers' Liability Act, and it ignores the fact that, quite apart from the FELA, the strict rule of the common law that there is no tort duty to act the "good Samaritan" has long been relaxed in cases where an employee became ill while working, though his illness was not the employer's fault. See, e.g., *Carey v. Davis*, 190 Ia. 720, 180 N.W. 889 (1921); Prosser and Keeton, *supra*, § 56, at p. 383.

 Coming back to the particulars of this case, we find the railroad's liability on the basis of respondeat superior to be plain with regard to Lachrone and Tynan, both of whom assaulted Lancaster out of exasperation with Lancaster's performance of his job. If a supervisor pursues his official duties with an excess of zeal, the employer is liable for the torts resulting from that excess; they are in furtherance of the employer's goals. Such an inference could also be drawn regarding Boyd if, as Lancaster thought, Boyd was trying to hit him with the sledgehammer. Of course if as is far more likely (for Lancaster testified that he had had no problems with Boyd before the incident) Boyd was merely careless, the railroad's liability would be even plainer.

The issue of respondeat superior is more difficult with regard to Funderburk, whose "goosing" of Lancaster was not related to Funderburk's supervisory duties; it was the pure expression of perversion, infantilism, bad taste, or some combination of these things. The usual view, as we saw earlier, is that when the motive for the employee's intentional tort is personal—which is to say unrelated to his employer's objectives and therefore not in furtherance of those objectives—the employer is not

liable under a theory of respondeat superior. But the case also went to the jury on the alternative theory to respondeat superior that the railroad was negligent in failing to prevent its employees from committing a series of intentional torts against Lancaster ("direct negligence"), and, as shown earlier, liability for direct negligence does not require proof that the employee was acting in furtherance of his employer's objectives. It does require, of course, proof of the railroad's negligence. Lancaster had to show that the railroad should have known that its supervisors were misbehaving; more concretely, that the railroad had information about their propensities, and failed to act on the information.

But there is an obvious difficulty with speaking of "the railroad" in this connection. A corporation is not a human being; "its" knowledge is the knowledge of particular employees. The question is therefore what level of employee need be informed to make the corporation liable (and whether an employee at that level knew of the supervisors' propensities in this case). Oddly, we can find little in the tort cases or commentary on this question, maybe because "direct negligence" is important only in those cases, which apparently are rare, where an employee commits a tort not in furtherance of his employer's business; in any other case respondeat superior provides a simpler route to establishing the employer's liability.

■■■ There is some authority for treating any supervisory employee as a responsible agent of the corporation, see *Merrick v. Missouri-Kan-Tex. R. Co.*, 141 Kan. 591, 42 P.2d 950 (1935); *Claris v. Oregon Short Line R. Co.*, 56 Idaho 169, 51 P.2d 217 (1935) (both, by the way, FELA cases), which would cook the railroad's goose in this case. In any event, although surprisingly the parties put in no evidence on the number of employees in the locomotive shop, we do know that the shop is a single building managed by a "master mechanic," and the railroad appears to concede that if the master mechanic knew of these supervisors' propensities to misbehave, the railroad is liable. The record contains no direct evidence on this point— Lancaster in effect having asked the jury to infer from the number of incidents, which especially in the case of Funderburk were not limited to the incidents with Lancaster, that the master mechanic must have known of the problem and should have taken steps to curb the supervisors. But the plaintiff in an FELA case can get to the jury with even slight evidence of negligence. *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957); *Heater v. Chesapeake & Ohio Ry.*, 497 F.2d 1243, 1246–47 (7th Cir.1974); *Mendoza v. Southern Pac. Transport. Co.*, 733 F.2d 631, 632–33 (9th Cir.1984). There was enough evidence of a pattern of supervisory abuse to allow a rational jury to infer that a reasonably careful railroad management, represented in the locomotive shop by the master mechanic, would have gotten wind of it and done something to stop it. No more was required to satisfy the undemanding requirements for proving negligence under the Act.

■■■ All that really matters, moreover, is that Tynan's misconduct be attributable to the railroad, as is easily done under a thoroughly conventional interpretation of respondeat superior. It was he (the jury could have found) who pushed Lancaster over the edge. That Lancaster may have been made especially susceptible to such misconduct by earlier acts for which the railroad might or might not be liable would be no defense. Under the "thin skull," or more colorfully the "eggshell skull," rule, the railroad would be fully liable for the consequences of Tynan's assault. See, e.g., *Vosburg v. Putney*, 80 Wis. 523, 50 N.W. 403 (1891); *Stoleson v. United States*, 708 F.2d 1217, 1221 (7th Cir.1983).

■■■ The railroad's next argument is that all the incidents but the one with Tynan, which occurred in 1979, were barred from consideration by the FELA's three-year statute of limitations. 45 U.S.C. § 56. A cause of action in tort arises when the victim is first injured, not when the injury reaches its maximum severity. See, e.g.,

*Nivens v. Signal Oil & Gas Co.,* 520 F.2d 1019, 1024, modified on other grounds, 523 F.2d 182 (5th Cir.1975). As early as 1977, following the Funderburk incident, Lancaster experienced definite symptoms of mental illness—most notably in the form of a hallucination in which he thought he saw a bug-like creature, almost a foot long, that had humanoid hands, feet, and face. He was diagnosed at that time as suffering from anxiety, which is a genuine, though generally mild, psychiatric ailment. (The diagnosis was odd, though; anxiety does not produce hallucinations.) Therefore, the railroad argues, Lancaster should have brought suit by 1980 (not 1982) if he wanted to complain about the Lachrone, Funderburk, and Byrd incidents.

The principle that the statute of limitations begins to run when injury first occurs has usually been applied to physical injuries. A man falls and breaks his hip. The break heals. Years later he develops crippling arthritis in the hip joint, and he wants to sue the person who caused the fall. The principle that sensibly bars suit in such a case is problematic when applied to a mental illness. The early symptoms of mental illness frequently are equivocal. Most people have occasional feelings of depression, anxiety, and suspicion that could be signs of mental illness but usually are not. Hostile acts by other persons are quite likely to trigger such feelings in thoroughly normal people. It would be absurd to have a limitations doctrine that sent these people running to court to file tort suits within three years of minor incidents on the off-chance that their feelings of distress might have been a precursor of serious mental illness. It appears that Lancaster was not even told by his doctors till after the incident with Tynan that he was suffering from an actual mental illness.

It is not the law that if you are scratched as a result of someone's negligence or other tort you must sue, even though the scratch is trivial, against the possibility that it might develop into something serious after the period of limitations has run. "Presumably there is room for a *de minimis* concept where there has been tortious

impact but such inconsequential manifestations that a reasonable person would not consider he was either injured or that it was appropriate to make inquiry." *Nivens v. Signal Oil & Gas Co., supra,* 520 F.2d at 1024. This must be even truer of symptoms of mental unease.

There is the further point that people who are mentally ill may not be thinking very straight about either their mental state or their legal rights. Lancaster's humanoidal bug would have placed a reasonable man on notice that he had a serious mental problem. But does a reasonable man hallucinate? Mental incompetence is a common ground for tolling the statute of limitations, and has been used in at least one FELA case. See *Brooks v. Southern Pac. Co.,* 105 Ariz. 442, 466 P.2d 736 (1970). But Lancaster did not raise this point in the district court, or argue it in his briefs in this court; the point is waived.

We are well aware that many cases hold that the three-year statute of limitations in the Federal Employers' Liability Act begins to run "upon the occurrence of the injury, regardless of whether the full extent of the disability is known at that time." *Fletcher v. Union Pac. R.R.,* 621 F.2d 902, 906 (8th Cir.1980). "The mere fact that the extent of the damage was not immediately manifest did not postpone the accrual of the cause of action." *Brassard v. Boston & Maine R.R.,* 240 F.2d 138, 141 (1st Cir. 1957). Yet the same cases make clear, following *Urie v. Thompson,* 337 U.S. 163, 169–71, 69 S.Ct. 1018, 1024–25, 93 L.Ed. 1282 (1949), that in cases of occupational disease, such as silicosis, the statute of limitations does not begin to run till the victim should have discovered the condition. Cf. *In re UNR Industries, Inc.,* 725 F.2d 1111, 1119 (7th Cir.1984). The reason for this rule suggests that it cannot be limited to occupational diseases. See *Illinois Central Gulf R.R. v. Boardman,* 431 So.2d 1126, 1128–29 (Miss.1983). When the "onset is insidious," *Young v. Clinchfield R.R.,* 288 F.2d 499, 502 (4th Cir.1961), the victim is not put on notice of his legal rights by the first symptom. This is as

true of schizophrenia as of silicosis when as in this case the onset of schizophrenia is insidious and the early symptoms ambiguous.

In any event, any error in applying the statute of limitations in this case was harmless. Suppose the jury had been instructed that the only tortious conduct that it could consider was Tynan's assault in 1979, which clearly was not time-barred. The expert witnesses seem agreed that it was that assault which triggered the schizophrenia on which Lancaster's entire claim of damages rests. The fact that the railroad had weakened Lancaster by earlier misconduct for which it could not be held liable would be irrelevant to its liability for Tynan's assault and to the amount of damages it would have to pay. The tortfeasor takes his victim as he finds him (emphatically so if the victim's weakened condition is due to earlier, albeit time-barred, torts of the same tortfeasor); that is the eggshell-skull rule. The single act of Tynan made the railroad fully liable for all the damages that Lancaster sought and the jury awarded.

No doubt if the railroad could have kept the earlier incidents from the jury it would have been in a better litigating posture. But there was little chance of that even if the statute of limitations barred liability for the previous incidents. Lancaster would have been able to introduce evidence of those incidents in order to help explain why Tynan's assault, a fairly minor incident in itself, had the effect it had on him and in order to strengthen his argument for the railroad's direct negligence. Cf. *Burns v. Penn Central Co.*, 519 F.2d 512, 514–15 (2d Cir.1975); *Hartel v. Long Island R.R.*, 476 F.2d 462, 464 (2d Cir. 1973); *Brooks v. Washington Terminal Co.*, *supra*, 593 F.2d at 1289–90; *Pehowic v. Erie Lackawanna R.R.*, 430 F.2d 697, 700 (3d Cir.1970). It would matter little from a practical standpoint whether evidence about them came in with or without a limiting instruction.

We need not consider whether evidence of those incidents might have been admissible on the alternative theory that if the last act in a series of tortious acts that can fairly be described as a continuing violation of the plaintiff's rights is within the statutory period for suit, claims based on the prior acts are not time-barred, the purpose being to avoid multiple suits. See, e.g., *Taylor v. Meirick*, 712 F.2d 1112, 1118–19 (7th Cir.1983).

The last issue relates to the judge's refusal to instruct the jury to reduce Lancaster's damages by the probability that he would have become schizophrenic even if the railroad's supervisors had not misbehaved. Lancaster points out that since the tortfeasor takes his victim as he finds him, if the victim is highly vulnerable that is the tortfeasor's bad luck; there is no discount to average damages. This is a thoroughly sensible principle, by the way. If a tortfeasor never had to pay more than the average victim's damages, victims as a class would be systematically undercompensated and tortfeasors as a class therefore systematically underdeterred, because victims with above-average injuries would get their damages cut down while victims with below-average injuries would not get an offsetting increase.

But a corollary to this principle is that the damages of the "eggshell skull" victim must be reduced to reflect the likelihood that he would have been injured anyway, from a nonliable cause, even if the defendant had not injured him. See, e.g., *Stoleson v. United States, supra*, 708 F.2d at 1223–24; *Steinhauser v. Hertz Corp.*, 421 F.2d 1169, 1173–74 (2d Cir.1970) (Friendly, J.)—the latter a case like this of traumatic schizophrenia. The purpose of this corollary is transparent in a case like *Dillon v. Twin State Gas & Elec. Co.*, 85 N.H. 449, 163 A. 111 (1932). The estate of Dillon, who was electrocuted by the defendant's negligence on his way down from the bridge he had just jumped off, was allowed to get damages only for the short time Dillon would have lived had it not been for the defendant's negligence. But the principle also applies to cases such as this where the tort victim is highly vulnerable to inju-

ry and the damages he suffered must therefore be discounted (multiplied) by the probability, distinctly less than one, that but for the tort he would have lived a normal life.

 It is desirable in such cases to direct the jury's attention to the issue by a specific instruction. But the failure to give such an instruction in this case was not reversible error. The judge's instruction on damages was sufficiently general to allow (though it did not compel, as it should have done) the jury to adjust damages downward for the probability that something other than tortious misconduct would have triggered Lancaster's latent schizophrenia; for he told the jury simply that they should award Lancaster the damages proximately caused by the alleged wrongdoing if they found the railroad liable. In its closing argument the railroad reminded the jurors of the psychologist's testimony that, had it not been for the alleged wrongdoing, something else in Lancaster's life would have set him off. Lancaster's counsel argued the contrary evidence of his expert witnesses but did not suggest that it would be improper for the jury to apportion damages according to the probability that Lancaster would have gone through the rest of his life without incident if he had not been victimized by the railroad. The jury was thus at least apprised of the issue.

More important, the railroad failed to offer a specific instruction. In a civil case it is not enough for a party, especially a sophisticated litigant like the Norfolk and Western Railway, merely to point out a subtle omission in the instructions and leave it to the plaintiff and the district judge to figure out as best they can how to repair it. A failure to offer a correct instruction normally will excuse the trial judge's giving an incorrect alternative, *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 570 (7th Cir.1984), and the same principle should apply to the failure to offer any instruction. Furthermore, the defendant put in no evidence that would have enabled the jury to make a sensible apportionment of damages between the defend-

ant's conduct and the normal vicissitudes of life that would have confronted Lancaster, and might have precipitated his madness, even if his supervisors had behaved. The instruction that the defendant requested, even if given, would thus have left the jury up in the air. It is the defendant's own fault that the jury was allowed to bring in a verdict that, given Lancaster's preexisting vulnerability to psychosis, may seem high.

AFFIRMED.