Rule 23 order filed
April 28, 2022.
Motion to publish granted
May 26, 2022.

2022 IL App (5th) 200377

NO. 5-20-0377

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| JOHN McCARTHY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 17-L-67 |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY | ) | |
| and GLEN ELLIOT, | ) | Honorable |
| | ) | Heinz M. Rudolf, |
| Defendants-Appellants. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justice Vaughan concurred in the judgment and opinion.
Justice Welch dissented, with opinion.

**OPINION**

¶ 1     The defendants, Union Pacific Railroad Company (Union Pacific) and Glen Elliot (Elliot),

appeal the October 13, 2020, judgment of the circuit court of St. Clair County, entered following

a jury verdict in favor of the plaintiff, John McCarthy, on his complaint for damages pursuant to

the Federal Employers' Liability Act (FELA) (45 U.S.C. §§ 51-60 (2012)) and common law

negligence. The jury awarded $3.14 million in damages against Union Pacific and $10,000 in

damages against Elliot. For the following reasons, we reverse and remand for a new trial.

¶ 2                                I. BACKGROUND

¶ 3     On February 14, 2017, the plaintiff filed a two-count complaint against his former

employer, Union Pacific, and his former supervisor at Union Pacific, Elliot. The complaint alleged

1

that the plaintiff was involved in a motor vehicle accident in 2015, while employed at Union Pacific, and injured his neck and back. It further alleged that Elliot, while in the scope and course of his employment from February 2016 to May 2016, grabbed the plaintiff's head and neck causing pain and injury to the plaintiff. Count I of the complaint was brought under FELA (*id*. § 51).

¶ 4 According to count I, the plaintiff sustained injuries as a result of these occurrences based on one or more of the following acts and/or omissions by Union Pacific: (a) Union Pacific, by and through its agent and employee, physically battered the plaintiff; (b) Union Pacific, by and through its agent and employee, caused the plaintiff to fear imminent physical contact initiated by Elliot (vicarious liability theories); (c) Union Pacific failed to have an effective system (through rules, training, discipline, or otherwise) in place to protect the plaintiff or its other employees from abusive coworkers; and (d) Union Pacific hired and retained Elliot when it knew or shown have known that Elliot was or would be abusive to his coworkers (direct liability theories).

¶ 5 Count II of the complaint had similar allegations and claimed common law negligence against Elliot alleging that the plaintiff sustained injuries and damages, resulting in whole or in part from Elliot: (a) physically battering the plaintiff and (b) causing the plaintiff to fear imminent physical contact by Elliot. The complaint sought both compensatory and punitive damages, though at trial, the plaintiff sought only compensatory damages and did not pursue punitive damages.

¶ 6 On December 2, 2019, the jury trial commenced. Brian Christianson, a senior supervisor of mechanical maintenance, testified via video deposition that he had worked for Union Pacific for almost 20 years. He confirmed that neither the plaintiff nor Elliot viewed videos on workplace violence, and stated he was unaware of any classes or meetings provided on that issue. He stated that the rule at Union Pacific when it came to unwanted physical contact between the employees

2

was that "it can't happen" because the company is "not going to tolerate having workplace violence."

¶ 7    Christianson reviewed the 2015 policy and explained that when unwanted physical contact took place, the person was supposed to report the incident to the Response Management Control Center (RMCC), which was the police force center that took calls in Omaha, and the person's management supervisor. After the incident was reported, from the RMCC perspective, they would go through their chain of command and involve officers or press charges if the incident was severe. The managers were to ensure the offending actions were discontinued. Christianson stated that he did not know if, after an accusation of unwanted physical contact was verified as true, that information would be documented in the employee's file. Nor did Christianson know if RMCC was required to contact the supervisor if a call went directly to RMCC. He did not believe a supervisor was required to contact RMCC if the report came directly to the supervisor.

¶ 8    Christianson confirmed that the only time he ever investigated allegations of unwanted physical contact was when the plaintiff brought his concerns to him regarding Elliot. Christianson testified that after an allegation was brought to the supervisor, the supervisor performed an investigation to determine what discipline, if any, was warranted. The normal discipline policy ranged from coaching to termination. The incident would go through an investigative process where the superintendent of the service union would be the determining factor, and Christianson confirmed the investigation included formal notice.

¶ 9    Regarding the plaintiff's complaint, Christianson stated that he spoke to Elliot about Rules 1.6 and 1.7 and the railroad's policy on violence and behavior in the workplace. He explained that all employees were given a rule book that iterated these policies, which were also available online. Christianson confirmed that, in the searches he ran, he never found any other instance, except for

3

the situation between the plaintiff and Elliot, where Elliot engaged in unwanted physical contact. He stated that if Elliot was previously accused, his name would have appeared.

¶ 10     David Scott, a machinist at Union Pacific, testified that he had worked for Union Pacific for approximately 12 years, and Elliot was his supervisor. He recalled the plaintiff being involved in a 2015 automobile accident in which the plaintiff was rear-ended while driving a Union Pacific truck. He also recalled that, around the same time as that accident, he had a conversation with the plaintiff in which the plaintiff advised him that he incurred a low back injury while squatting too low when working out at the gym. When asked to describe Elliot, Scott's response was extremely favorable, stating that Elliot "took care of his troops. He took care of his people." Scott denied ever hearing of anyone claiming that Elliot assaulted a worker or that Elliot had some type of unwanted physical contact with any of the employees.

¶ 11     Bret Calvert, a machinist, testified that he had worked for Union Pacific for approximately five years. Based on his knowledge of the safety policies, he stated that throwing objects was prohibited if the action could cause an injury, fire, or hazard. Calvert stated that in 2016, Elliot was his supervisor, and he also worked directly with the plaintiff once a week or once every two weeks. Between the time of the plaintiff's 2015 accident through 2016, Calvert did not notice any change in the plaintiff's work performance. Calvert testified that on May 24, 2016, he was present for a job briefing. He was sitting toward the back when he heard a door open and saw Elliot enter. He then looked back down until he began to hear people saying that Elliot threw a box at the plaintiff. He worked with the plaintiff after the incident but did not remember the plaintiff saying anything to him about how he was feeling, nor did he recall ever thinking that the plaintiff was hurt or that something seemed to be wrong after the May 24, 2016, incident.

4

¶ 12　Glen Elliot was called as a witness by the plaintiff. He began working for the railroad industry in 1966 and began working for Union Pacific in 1997. His current position was Foreman General I. Elliot had known the plaintiff since 2012. He opined that the plaintiff was a great worker and was being groomed to eventually take over Elliot's position upon his retirement. He stated that his department was responsible for locomotive maintenance, which was a very physically demanding job. He was aware that the plaintiff was involved in a motor vehicle accident while driving a Union Pacific truck in 2015. Elliot spoke to the plaintiff immediately after that accident via telephone and in person when the plaintiff got back to the railroad. Both times when Elliot asked the plaintiff if he was hurt, the plaintiff said he was okay and did not need to see a doctor. Elliot stated that he told the plaintiff he needed to complete an accident report but agreed that the plaintiff followed the rules by reporting the incident to him and that no accident report would be necessary since the plaintiff stated he was not injured and the truck was not damaged. Following the accident, Elliot did not notice any change in the plaintiff's job performance and did not think the plaintiff looked like he was in pain while performing his job duties.

¶ 13　Elliot agreed that the Union Pacific policies and rules were important for the protection of both the public and the employees and that the rules applied to every Union Pacific employee. He acknowledged that the rules required employees be responsible for their own personal safety and behavior. Under the General Code of Operating Rules (GCOR), employees must not be careless in the safety of themselves or the public. He agreed that the rules stated that employees should not drop or throw tools, materials, or other objects that might cause personal injury and stated he was aware of this rule in 2016. He also acknowledged Union Pacific's no-tolerance policy that prohibited unwanted physical contact that was effective as of May 11, 2015.

¶ 14    As to the alleged events, Elliot denied squeezing the plaintiff's neck on February 22, 2016. He stated he rubbed the top of the plaintiff's crew cut, as he had done in the past. On this day, though, when he touched the plaintiff's head, the plaintiff said, "Don't do it anymore," "it hurts," and he responded "okay" and took that to mean the plaintiff did not want him to touch him anymore. Elliot denied that any incident occurred on February 24, 2016. Elliot admitted that he again touched the plaintiff on April 25, 2016, and stated that he walked up behind the plaintiff, massaged his shoulders, and said something like "Go get 'em today, Tiger." He denied shaking the plaintiff's head from side to side but admitted that the plaintiff again said, "Don't touch me."

¶ 15    Elliot also admitted that he tossed a three-to-four-pound box to the plaintiff on May 25, 2016, and said, "This is for you Lightning"—Lightning being the plaintiff's nickname—before he threw the box. Elliot later heard from other employees that the plaintiff said he got hurt from the incident. Elliot stated that after the incident, the plaintiff reported both the box throwing incident and the "shoulder rubbing" incident to Elliot's supervisor, Brian Christianson. Elliot stated that thereafter, Christianson told him not to touch the plaintiff again.

¶ 16    As to the alleged May 29, 2016, incident, Elliot stated that he went into the office looking for time sheets. They were not located where they usually were but were lying on a cabinet located to the right of the plaintiff. Elliot stated that he walked up next to the plaintiff, leaned over, and retrieved the time sheets. He denied lunging at the plaintiff.

¶ 17    Elliot stated that he was 75 years old. After high school, he worked a couple jobs and later joined the Marine Corp until 1966. At that time, he entered the Reserves and started working for Cotton Belt Railroad. He was working as a foreman in 1997 when Union Pacific took over Cotton Belt and thereafter worked as a Foreman General I for Union Pacific. He stated that the plaintiff came to Union Pacific in 2012. They became close friends, went on a motorcycle trip together,

and bought items for each other. Elliot stated he had no issues with the plaintiff prior to February 2016. He recalled an incident at the end of 2015 when the plaintiff advised Elliot that his back was stiff and requested assistance "hostling" some locomotives which involved pointing a locomotive in the correct direction. Elliot agreed to assist, and the plaintiff drove the locomotive while Elliot performed the physical work that involved climbing up and down and throwing the switches.

¶ 18    Elliot explained that if an employee was injured at work, there was a two-step process required by Rule 1.2.5. The person must report the incident to the proper manager and then complete an accident form. Elliot testified that the plaintiff did not report any of the incidents to him, never reported any injury to him, and never asked to complete an accident report. He stated that if the plaintiff had reported an injury, he would have had the plaintiff complete an accident report.

¶ 19    Following Elliot's testimony, Christianson was called to testify live at the hearing. He confirmed that he was the manager for mechanical maintenance which was the same position he held in 2016 and was a supervisor to both the plaintiff and Elliot at that time. He explained the difference between critical rules, in which an employee or the public could be killed, and the noncritical rules. He stated that usually the noncritical rules would involve coaching and the critical rules would result in termination. He confirmed that incidents of coaching were placed in the employee's personnel file.

¶ 20    Christianson testified that when the plaintiff came to him in May 2016, the plaintiff only advised him of one touching incident involving Elliot. He stated that employees had a handful of ways in which they could report a situation, including the ethics hotline, the safety hotline, the values hotline, or they could go to their supervisor. Christianson testified that when the plaintiff advised him of Elliot's physical contact there was a potential policy violation. He explained that

7

policy violations and rule violations were distinctive and clarified that policy violations typically did not result in coaching, discipline, or termination. Only if workplace violence was egregious would it result in termination. Christianson also testified that when the plaintiff advised him of the incident that the plaintiff did not tell him that he was hurt, and that the plaintiff did not fill out any accident report claiming any injury. He stated that the plaintiff only complained about Elliot tossing a box in his lap and one prior touching incident. He confirmed that he was aware of witnesses to the box tossing incident and stated he did not speak to the other witnesses. He stated that he spoke with Elliot who admitted rubbing the top of the plaintiff's head and admitted tossing the box into the plaintiff's lap. Christianson confirmed that he did not discipline or coach Elliot. Christianson disagreed that the plaintiff ever told him he was concerned about his work environment or felt unsafe; he stated that the plaintiff only told him that he wanted Elliot's actions to stop. Christianson did not believe he told the plaintiff that he spoke with Elliot, what he discovered during his investigation, or that the plaintiff's concerns had been addressed. Christianson confirmed that when the plaintiff reported the incidents, the plaintiff never said he was injured from either incident. If he had, Christianson would have made sure a report was filed and that the plaintiff obtained medical attention.

¶ 21    Christianson testified that shortly after the last incident, the plaintiff came to him with a letter from his physician setting a 10-pound lifting restriction. In response, Christianson advised the plaintiff that Union Pacific did not have the ability to accommodate the restriction, explaining there was no light duty for people in the plaintiff's job. Christianson testified that he did not discipline Elliot because he did not believe that Elliot's actions were in violation of the company policies or rules. He did not have concern about these events because the plaintiff told him he wanted the incidents to stop, and after speaking with Elliot, Elliot assured him they would.

8

¶ 22    Christianson also opined that the plaintiff, as a supervisor, would have been aware of the rule that required him to complete an accident report. All injuries that incurred on duty had to be reported on the company form; however, the plaintiff never claimed any injury. Christianson agreed that when the plaintiff told him about the incidents that he also told him that he told his coworkers to write down the date and time because a lawyer was going to be talking to them about it. Christianson confirmed that he searched the company's databases, including the RMCC databases, and found no prior incidents ever reported against Elliot.

¶ 23    Dr. Matthew Gornet, a board-certified specialist in spine surgery, testified via video deposition that he began treating the plaintiff on December 2, 2015, for complaints of neck and lower back symptoms. From December 2, 2015, until June 6, 2016, no work restrictions were provided. Dr. Gornet stated that on March 31, 2016, the plaintiff advised him that his back issues were affecting his quality of life, so they discussed waiting on treatment for his neck and focusing on his back issues. On June 6, 2016, he put the plaintiff on light work duty with a 10-pound lift restriction because the plaintiff reported that his neck pain had increased and was locking up. On November 7, 2016, the plaintiff reported an injury with a supervisor at work to Dr. Gornet. The physician stated that it was their assessment that the work injury contributed to the plaintiff's current back issues. On February 1 and 3, 2017, Dr. Gornet performed a spinal fusion at L5-S1 to stabilize the spine and keep the injured portion of his spine from moving or causing further pain. He continued to see the plaintiff following the back surgery. In July 2017, he performed an additional microdecompression to further free up the nerve. Dr. Gornet performed neck surgery on July 26, 2017, and April 25, 2018.

¶ 24    Dr. Gornet testified that he compared the plaintiff's 2015 MRI images of his neck (taken before the plaintiff's work injury) with his 2017 images and stated that the plaintiff's disc injury

at C3-C4 had increased in size in the 2017 images and a new tear was seen on the 2017 MRI. He stated there may have also been an increase in the C6-C7 herniation. Dr. Gornet saw the plaintiff 10 more times after the 2018 surgery, and the last visit was on March 25, 2019. He reported that the plaintiff felt much better, his pain reduced following surgery, and he would continue to follow the plaintiff long term. It was his opinion that, assuming the plaintiff's description of the incidents regarding Elliot's actions toward him was factually correct, Elliot's conduct on February 22, 2016, February 24, 2016, April 25, 2016, and May 24, 2016, could have easily not only aggravated the plaintiff's underlying injury but also caused a new injury. He put the plaintiff on permanent restrictions of a 20-pound lift limit and no overhead work.

¶ 25    Dr. Gornet confirmed that he had no records showing that when the plaintiff visited him on March 31, 2016, or June 6, 2016, that the plaintiff said anything about any incidents with Elliot and agreed that his work notes continued to link the plaintiff's complaints to the June 22, 2015, automobile accident. He further confirmed that the plaintiff personally completed the June 6, 2016, questionnaire which also stated that his visit stemmed from the June 22, 2015, automobile accident. Although the plaintiff advised Dr. Gornet of the altercations with the supervisor in November 2016, Dr. Gornet agreed that his January 5, 2017, and April 25, 2018, office notes continued to state that he believed the plaintiff's symptoms were related "to his work-related motor vehicle accident of June 22, 2015." He further confirmed that the plaintiff's questionnaires from those dates also related his symptoms to the 2015 car accident.

¶ 26    The plaintiff testified live and stated he was 33 years old, married and had two children, one 20 months old and one three weeks old. He began working at Alton & Southern Railway in June 2007 and at Union Pacific in February of 2012. He was a Foreman General II which involved a broad spectrum of responsibilities that he performed in the railroad locomotive department. He

did both office and heavy-lifting physical work. He stated that following the 2015 motor vehicle accident he began experiencing back pain and was eventually referred to Dr. Gornet. He stated that from the time of the accident in 2015 through February 2016, he worked every day with no restrictions. During that time, he was able to participate in his hobbies including golfing, boating, and riding his motorcycle. The plaintiff stated that no neck or back surgery was ever recommended prior to 2016, denied ever injuring himself at the gym, and disputed the accuracy of the video reenactments prepared and provided by Union Pacific.

¶ 27 The plaintiff had known Elliot since 2012. Prior to February 2016, he considered Elliot a friend and thought they had a great relationship. The plaintiff stated he was doing extremely well at work and was under the impression that he would eventually take Elliot's position. Though he still considered Elliot a friend at that time, he felt their relationship started to change after the incident on February 22, 2016, when Elliot came up from behind and squeezed his neck very hard out of nowhere. The plaintiff stated the action caused him significant pain. He stated that when Elliot squeezed his neck, the plaintiff told Elliot to stop, that he was in a lot of pain, and to never touch him again. The plaintiff stated that two days later he was sitting at his computer when Elliot walked in and stood next to him. He turned toward Elliot, and they began chatting. When they were done talking, Elliot started to walk away to leave, and he turned back to face his computer. The plaintiff stated, out of nowhere, Elliot grabbed his forehead and snapped his head back to the point that he was looking at the ceiling. He screamed at Elliot, "Man, you're hurting me. I told you never to touch me again." The plaintiff stated he did not report Elliot to Christianson after these first two incidents because he did not want to get Elliot in trouble, and he gave Elliot the benefit of the doubt that he would stop touching him since he had told him twice to stop.

11

¶ 28    The plaintiff stated that on April 25, 2016, he was in the Foreman General II office listening to voicemails on a cell phone when, out of nowhere, Elliot came up from behind, grabbed the top of his head, and jerked his neck from side to side several times. The plaintiff stated that he screamed at Elliot again and may have even cussed at him. The plaintiff told Elliot, "I told you not to ever touch me again. You're hurting me." The plaintiff stated he was in extreme pain and was very frustrated that Elliot would not stop touching him. He stated, at this point, that he was in an extremely difficult and stressful situation that felt very hostile to him, and he was afraid to go to work because of the previous two incidents. The plaintiff confirmed that he did not report this incident either.

¶ 29    The plaintiff testified that that on May 24, 2016, he was conducting a safety meeting when Elliot opened the door, had a heated interaction with Mike Wing, then turned and threw a box at the plaintiff. He stated that he did not realize Elliot was going to throw the box at him before he threw it, and once he saw the box flying toward him, he jerked to catch it. He stated the box contained an air gauge and weighed at least four pounds. The plaintiff stated that catching the box hurt, and he was in instant pain, especially in his neck, and his back started aching worse throughout the day. He stated that the four other employees who witnessed Elliot throw the box at him were very upset. Following the incident, the plaintiff immediately called Christianson who came to see him. The plaintiff stated that he advised Christianson of all four prior incidents and iterated that he told Elliot to stop touching and hurting him on multiple occasions. He stated that he told Christianson that he was hurt and in horrible pain. He conveyed to Christianson that he was afraid to come to work, had been dealing with this for months, was extremely stressed out, felt like he was in a hostile environment, and did not feel safe being at work with Elliot there.

¶ 30    The plaintiff testified that Christianson told him that he would handle the situation with Elliot. When Christianson left his office, he was under the impression that Christianson was going to investigate his allegations. The plaintiff stated that he spoke with Christianson on the phone the following week, and Christianson told him he was not sure how he should handle the situation and that he needed to think about how to address it. The plaintiff stated that Christianson told him he would call him back by the end of the day but did not. The plaintiff confirmed that Elliot never got physical with him again after the May 24, 2016, incident.

¶ 31    The plaintiff again spoke with Christianson the following Sunday morning. Two days after that conversation, on May 31, 2016, the plaintiff was sitting at his desk when Elliot entered the room and walked straight up to him. The plaintiff stated this caused him to lunge back and put his hands up. He asked Elliot what he was doing and stated that Elliot towered over him with an angry look on his face. He stated he was scared at this point. Elliot responded, "Oh, I'm just getting a piece of paper." Elliot then grabbed a random piece of paper and walked off. He did not have any further encounters with Elliot and the next day was the last day he worked at Union Pacific.

¶ 32    The plaintiff testified that Elliot's actions put him in a downward spiral. He could not sleep, he was scared to go to work, and he was scared Elliot was going to hurt him or do something worse. He was scared Elliot was going to paralyze him, and he continued to spiral. The plaintiff testified that Elliot ruined his life, and it would never be the same. He was diagnosed with depression and put on medication. There were times that he did not want to live anymore. His day-to-day life was affected as every movement brought him pain, even just sitting in his recliner or bending over to lift the toilet seat. He was in constant pain in both his back and neck. He had racing thoughts about why this happened to him, whether it would ever get better, and if he would ever feel normal again.

13

¶ 33    The plaintiff explained that he was not accurate on the medical history forms at the physicians' offices because there were so many different questions, and it took so long to fill out while he was sitting in an uncomfortable office chair with no padding. He stated that he did have very thorough conversations with his doctors and their assistants. He disagreed that the first time he told Dr. Gornet about his supervisor's actions was in November 2016, stating he told Dr. Gornet and his assistant, Nathan, prior to that date.

¶ 34    In addition to treating with Dr. Gornet, the plaintiff stated that he also received treatment from his chiropractor, Dr. Cheely. The plaintiff stated that he discussed the pain he was experiencing and the incidents involving his supervisor with his chiropractor. He was later referred to see Dr. Joel Wietfeldt because after the first back surgery he had a big bulge that was constantly painful and burning on his left side. He stated that his family physician, Dr. Roger Wujek, continued to prescribe medication for his depression.

¶ 35    The plaintiff testified that he last worked at Union Pacific on June 1, 2016, the same day that Elliot intimidated him in his office. Prior to that, he was making approximately $82,000 annually and received health insurance benefits, 50% matching of up to 6% of his income for his 401(k), dental and vision benefits, a gym membership, and other various perks. Prior to getting hurt, he planned on moving up the ladder at Union Pacific to the position above Christianson's and potentially working at the railroad until the age of 70 when he would retire. The plaintiff stated he began applying for jobs in March or April of 2019, after his surgeries. He applied to over 30 jobs, mostly office positions, where his physical restrictions could be accommodated. He had one interview but had yet to be offered a position. He planned to continue looking for a job. He was currently a stay-at-home father with constant neck and back pain ranging anywhere from an ache to the point where he needed to take ibuprofen. He stated he took ibuprofen every day, especially

to sleep. Prolonged activities increased his pain. He sold the boat, no longer had his motorcycle, and no longer golfed.

¶ 36    On cross-examination, the plaintiff confirmed that he never completed an accident report following the June 2015 automobile accident or after any of the alleged incidents involving Elliot. The plaintiff stated that following the 2015 car accident, he began receiving treatment from his chiropractor for his neck and back. A few months after the accident, he began treating with Dr. Lee, an orthopedic surgeon, on a referral from his chiropractor. Dr. Lee wanted to treat him conservatively first and stated if he did not get better, he would perform surgery. In early December 2015, the plaintiff went to Dr. Gornet because Dr. Lee could only offer a fusion and Dr. Gornet could perform disc replacement surgery. He disagreed with Dr. Gornet's testimony that it was his suggestion to work on his lower back first, stating it was Dr. Gornet's suggestion. He further disagreed with Christianson and Elliot's testimony about his 2015 accident, stating he told both that he was in pain from the accident and later told them he was receiving medical treatment. The plaintiff also stated that his employees performed the physical parts of his job because he wanted his body to heal during that time.

¶ 37    The plaintiff confirmed that May 24, 2016, was the first time he notified Union Pacific of the incidents with Elliot. He further confirmed that he had no further physical contact from Elliot after his initial conversation with Christianson on May 24, 2016. The plaintiff testified that Christianson advised him on May 29, 2016, that he had spoken to Elliot about the incidents and that Christianson told him that he made sure it would never happen again. The plaintiff believed that Elliot became physical because he felt that the plaintiff was pushing him out the door, doing a better job than him, and making Elliot look bad.

15

¶ 38    The plaintiff stated that he was off work for about a month on medical leave before his wedding on July 2, 2016. Thereafter, he went on a family vacation to Florida. The plaintiff stated that he was a wrestler in high school and continued to wrestle the students after he graduated while working as an assistant wrestling coach. He testified that he gave up wrestling and running after the June 2015 accident. He disagreed with his earlier deposition that all his medical bills had been paid by his insurance. When asked if he had any intention of returning to work at Union Pacific, he stated that he did not want to work for an unsafe company that did not take their safety rules seriously or follow them. He had not applied for any jobs with his prior employer, Alton & Southern. As to the jobs he had applied for, the plaintiff believed that he would need an accommodation for those jobs if he was hired.

¶ 39    Dr. Wietfeldt, a board-certified plastic surgeon at the Springfield Clinic, testified via video deposition regarding his treatment of the plaintiff, who was referred to him following back surgery. At that time the plaintiff had swelling on the left side of his abdomen near the site of his incision and was experiencing some burning discomfort. A CT scan revealed a small umbilical hernia, but no incisional hernia. A plan of treatment was created wherein he would treat the plaintiff's scar, not necessarily the hernia, by surgically tightening the abdominal core. The surgery was performed, and the plaintiff was ordered to wear a binder for the first three weeks of recovery and was restricted to a 30-pound weight limit for the first six months. On August 6, 2019, Dr. Wietfeldt had a three-month post-op visit with the plaintiff. During this examination, under active problems, he noted that the plaintiff had back pain but, overall, he was doing very well and had no concerns or issues. Dr. Wietfeldt confirmed that, at that point, the restrictions were also removed.

¶ 40    Dr. Wujek, who is board certified in family practice, testified that he had treated the plaintiff for his entire life, including the period from June 15, 2015, through November 8, 2017.

He diagnosed the plaintiff with back pain on January 10, 2017, when he was performing a pre-operative assessment. The note indicated the plaintiff's injury stemmed from a June 2015 car accident that occurred while the plaintiff was working for the railroad. Dr. Wujek noted that the plaintiff had symptoms of depression on January 9, 2018, stemming from financial and employment stressors, as well as pain, and prescribed medication for the condition. He also performed a pre-operative examination for the April 2019 hernia surgery, which he later opined was an unnecessary risk.

¶ 41    The plaintiff's wife, Jennifer, testified live during the trial. She stated that following the June 2015 car accident, her husband did not have issues other than occasional soreness. She stated that he saw a chiropractor to help him manage pain. He was able to work every day and continue his hobbies of boating and riding his motorcycle. Starting in March 2016, she became aware that the plaintiff was having issues at work with Elliot. The plaintiff would come home at night and consistently complain to her about the altercations. He stopped actively working for Union Pacific in June 2016. Once the incidents with Elliot started occurring, the plaintiff was in constant pain, could not sleep, was constantly tossing and turning, and had a hard time functioning. He was depressed, could not work, and could not participate in his hobbies or other normal activities. The pain issues were not resolved until the plaintiff received his subsequent back and neck surgeries. After the surgeries, the plaintiff got a lot better, both physically and mentally. She was able to get pregnant six months after the surgeries, she finally "saw a light at the end of the tunnel," and she believed that they were "going to make it through this."

¶ 42    Portions of Dr. Cheely's records were read to the jury. The records indicated that the plaintiff presented on February 25, 2016, with 75% to 100% constant pain that was sharp, aching, burning, shooting with tightness, and discomfort in his back and neck. The note indicated that, "A

17

manager squeezed [the plaintiff's] neck on 2/22/16, causing bad pain and on 2/24/16, the same manager came up from behind, again unannounced, and pulled his head backwards, causing bad pain again." The April 28, 2016, note stated the plaintiff sought treatment after Elliot shook his head from side to side, which flared up his symptoms. The May 26, 2016, note stated, "A manager walked in at work, threw a 4-pound box at [the plaintiff] unexpectedly during a safety meeting [the plaintiff] was conducting. He threw it in anger after yelling at an employee in the meeting. Increased pain in neck and low back resulted." The June 2, 2016, note indicated that the plaintiff's previous treatment lasted for approximately two days and then his neck started locking up and hurting very bad. The plaintiff believed his pain and neck locking was the result of jerking to catch the box thrown at him by Elliot. Lastly, on June 7, 2016, the plaintiff sought treatment, complaining of continuous pain that was sharp and aching, shooting and tightness, and discomfort in his back and neck.

¶ 43     A record from Dr. Wietfeldt's facility from Dr. Kuhnke was read into the record regarding evaluation of an incisional hernia and back surgery in 2017 and stated the injuries were initially sustained in a car accident but worsened via an injury at work. A record from Dr. Gornet's June 6, 2016, notes was read into the record and addressed the plaintiff's continuing neck and low back pain as well as his depression and work restrictions. The record also addressed the planned AP spinal fusion of L5-S1 and opined that the plaintiff's symptoms and treatment were causally connected to his work-related accident. Copies of the September 2, 2015, October 16, 2015, January 5, 2017, and May 15, 2017, MRIs were admitted into the record along with medical bills from Dr. Gornet, MFG Spine, LLC, Orthopedic Center of St. Louis, and CT Partners of Chesterfield, LLC, as well as three surgical photographs.

18

¶ 44 The plaintiff rested and the defendants moved for directed verdict arguing *inter alia* that the plaintiff failed to establish that Union Pacific had notice of any incidents he alleged caused his injuries. In opposition, the plaintiff argued that Elliot, as a Union Pacific employee, had notice of the acts and potential harm. The trial court denied the motion for directed verdict.

¶ 45 Thereafter, the defendants commenced their case-in-chief by playing a portion of Dr. Rhoderic Mirkin's video deposition for the jury. Dr. Mirkin testified that he was an orthopedic surgeon with a subspecialty interest and training in spinal disorders. He reviewed the plaintiff's medical records, diagnostic films, operative reports of the surgeries performed by Dr. Gornet, and several depositions. The records demonstrated to him that the plaintiff's injuries and treatment prior to February 2016 indicated that the 2015 car accident was severe. The plaintiff sought several months of treatment for his neck and back pain. His MRI documented four herniated discs in his neck and one in the lower back. Notably, this all occurred and was documented prior to the alleged conduct of Elliot. Looking to the MRIs from 2015 and 2017, he saw no change in the structural pathology of the cervical spine. Based on his review of the records, and within a reasonable degree of medical certainty, he opined that the plaintiff had four herniated discs in his cervical spine at C3-C4, C4-C5, C5-C6, and C6-C7 prior to February 2016. The plaintiff also had annular tears at C5-C6 and C6-C7 and a disc herniation or protrusion in his lumbar spine at L5-S1. Dr. Mirkin opined that none of the alleged incidents as described by Elliot caused or contributed to any new injury to the plaintiff's cervical or lumbar spine. This opinion was based on the fact that the injuries existed prior to the incidents and that none of the described conduct would be capable of causing a herniated disc in the lower back, or aggravating it, or causing one in the neck. He stated that even if he assumed that the plaintiff's description of the alleged conduct was correct, it was still his opinion that there was no significant trauma to the lower back or significant injury to the neck as

19

a result of those incidents. He did not believe the plaintiff's surgeries, or his permanent restrictions, were necessitated by any of the alleged conduct described by the plaintiff.

¶ 46    Michael Wing testified live at the trial and stated that he was a lead machinist and began working for Union Pacific in January 2011. He stated that Elliot became his supervisor in 2013 and he considered Elliot to be very fair and accommodating as a boss. As to the incident on May 24, 2016, Wing testified that he was sitting in the safety meeting when Elliot entered and said good morning to everyone. He stated that Elliot did not yell at him or anyone else and apologized for interrupting the meeting. The plaintiff was looking at Elliot before he tossed the box. Elliot did not say anything to the plaintiff other than that he would be back in a few minutes after the briefing was over. When the plaintiff caught the box, he did not move any part of his head, neck, or body other than his hands. After the briefing was over, the plaintiff asked him and another employee to note the date and time in case a lawyer contacted them later. Wing stated that no one was upset with Elliot over the incident, and the plaintiff never said he was injured or in pain. He admitted that at the time of his testimony, he was still employed at Union Pacific, and Elliot was still his supervisor. He testified that after the incident occurred, he took the box, opened it, and observed the air filter it contained. He then provided a similar air gauge to the defense, which, combined with the weight of the box, weighed 1.8 pounds; however, he admitted there was also a gauge weighing 3.7 pounds that could have fit in the same sized box and that the shipping label read 4 pounds.

¶ 47    Nicholas Bova, a lead locomotive machinist for Union Pacific, testified live and was also present at the briefing meeting on May 24, 2016. He saw Elliot toss the box to the plaintiff. His testimony was substantially the same as Wing's testimony regarding the occurrence.

20

¶ 48    The defense then played several portions of the plaintiff's video deposition for the jury. The relevant testimony was that the plaintiff admitted that he did not fill out any reports with law enforcement or Union Pacific following the alleged incidents involving Elliot. The plaintiff stated that he was 100% healthy prior to the motor vehicle accident and that, had the accident not occurred, he did not think Elliot's actions would have harmed him further, and he would have been fine following the alleged incidents. The plaintiff also confirmed that he was aware of the rule in effect that required him report all injuries to Union Pacific, whether they occurred on or off duty.

¶ 49    The defense submitted additional medical records from Dr. Cheely that addressed the plaintiff's treatment from July 2, 2015, to February 2016. The records revealed that Dr. Cheely treated the plaintiff 31 times prior to the alleged first incident with Elliot and that the plaintiff reported shooting pain and numbness in his legs and arms at the time of that treatment. The defense then rested and renewed the motion for directed verdict, which the trial court denied. Closing arguments, which are addressed more specifically below, were given the next day, followed by instruction from the court. The case was then given to the jury for deliberation.

¶ 50    On December 5, 2019, the jury returned a general verdict in favor of the plaintiff against each defendant. The first verdict was against Union Pacific and awarded damages to the plaintiff totaling $3.14 million. The award was comprised of $100,000 for loss of normal life experienced and reasonably certain to be experienced in the future; $300,000 for the pain and suffering experienced and reasonably certain to be experienced as a result of the injuries; $140,000 for the emotional distress experienced and reasonably certain to be experienced in the future; $500,000 for the reasonable expense of necessary medical care, treatment, and services received and the present cash value of the reasonable expenses of medical care, treatment, and services reasonably certain to be received in the future; and $2.1 million for the value of salaries and benefits lost and

21

the present cash value of the salaries and benefits reasonably certain to be lost in the future. The second verdict was against Elliot and awarded the plaintiff damages in the amount of $10,000 for the emotional distress experienced and reasonably certain to be experienced in the future.

¶ 51    The defendants subsequently filed a motion for a judgment notwithstanding the verdict (judgment *n.o.v.*) or, alternatively, a new trial. Following a hearing, the trial court entered a written order denying the defendants' motions. The defendants appealed.

¶ 52                                    II. ANALYSIS

¶ 53    On appeal, the defendants argue that: (1) either judgment *n.o.v.* or a new trial is warranted because the plaintiff failed to prove Union Pacific's negligence under FELA, (2) a new trial is warranted where plaintiff's closing argument was so prejudicial that the defendants were denied a fair trial, and (3) either a new trial or remittitur is appropriate where the jury's verdicts were irreconcilably inconsistent. We address these issues in turn but only briefly address the issue of inconsistent verdicts in the context of our discussion of the plaintiff's closing argument.

¶ 54        A. Motion for Judgment *N.O.V.* or New Trial as to Count I (FELA Claim)

¶ 55    We begin by reviewing the propriety of the circuit court's decision denying the defendants' motion for judgment *n.o.v.* or new trial as to count I of the plaintiff's complaint, which alleged a cause of action pursuant to FELA. A trial court's ruling on a motion for judgment *n.o.v.* is subject to *de novo* review. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999). A judgment *n.o.v.* " 'should not be entered unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.' " *Id.* (quoting *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 109 (1997), and citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In other words, a motion for judgment *n.o.v.* presents 'a question of law as to whether, when all of the

22

evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)).

¶ 56    In contrast to a judgment *n.o.v.*, a new trial is appropriate where a judgment *n.o.v.* is improper (because there was not a total failure or lack of evidence), but the jury's verdict was nevertheless against the manifest weight of the evidence. *Id.* "A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary, and not based upon any of the evidence." *Id.* at 179. We review the circuit court's decision with respect to a motion for a new trial for an abuse of discretion. *Id.* It is with these standards in mind that we review the elements the plaintiff was required to prove to recover under FELA, in light of the evidence in the record as it relates to the jury's verdict.

¶ 57    Section 51 of FELA provides that a common carrier is liable for injuries to its employees "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U.S.C. § 51 (2012). The purpose of FELA was to "make the railroad liable for the negligence of its employees as well as for 'its own' negligence in failing to provide adequate safety appliances and safe working conditions." *Lancaster v. Norfolk & Western Ry. Co.*, 773 F.2d 807, 817 (7th Cir. 1985).

¶ 58    To prove vicarious liability under FELA, the plaintiff must show that the employee's actions were negligent/intentional and were committed in the furtherance of the employer's objectives. *Id.* at 818. In contrast, under a direct liability theory, the plaintiff must prove negligence on the part of the employer, such as negligent hiring, supervising, or failure to fire the employee.

23

See *id.* In other words, to prove a direct negligence claim under FELA, the plaintiff must prove the common law elements of a negligence claim on the part of the railroad, including duty, breach, foreseeability, and causation. *Morris v. Union Pacific R.R. Co.*, 2015 IL App (5th) 140622, ¶ 33. The elements necessary then, to prove the plaintiff's claim under FELA, differ depending on whether the plaintiff is alleging vicarious liability under FELA due to an injury negligently caused by an employee of the railroad,[1] or whether the plaintiff is alleging direct liability on the part of the railroad as a result of the railroad's failure to provide a safe work environment.

¶ 59   Here, as outlined above, the plaintiff alleged both vicarious and direct liability theories under FELA in count I of his complaint. Accordingly, a judgment *n.o.v.* would be improper if the plaintiff can sustain his burden to prove FELA liability under either theory, because in that case, there would not be a total lack of proof of the plaintiff's right to recover under FELA. See *York*, 222 Ill. 2d at 178 (judgment *n.o.v.* is only proper when the plaintiff fails to present evidence sufficient to support a necessary element of the plaintiff's claim). On appeal, Union Pacific argues only that the plaintiff failed to meet his burden to prove direct negligence on the part of Union Pacific because there is no evidence in the record of the foreseeability of the plaintiff's injury at the hands of Elliot, whether by way of actual or constructive notice. However, Union Pacific's argument, or lack thereof, leaves the plaintiff's FELA claims for vicarious liability intact.

¶ 60   Union Pacific has not argued that the plaintiff failed to prove an essential element of his vicarious liability theory in support of his FELA claim. Accordingly, we find that a judgment *n.o.v.* on count I of the plaintiff's complaint, which alleges a cause of action under FELA, is improper, because the evidence in the record does not completely foreclose Union Pacific's liability under

---

[1]We note that it is irrelevant whether Elliot's actions are to be characterized as negligent or intentional, as intentional acts are considered negligence within the meaning of FELA. See *Jamison v. Encarnacion*, 281 U.S. 635, 641 (1930).

24

FELA. Union Pacific has not argued that there was a lack of evidence in support of the plaintiff's vicarious liability theory, and thus we find that it has forfeited any such argument. See Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited). Accordingly, because Union Pacific failed to show a total lack of evidence as to its liability under FELA, we find the circuit court's decision to deny Union Pacific's motion for judgment *n.o.v.* on count I of the plaintiff's complaint is correct. Union Pacific's alternative request for a new trial, based on an inconsistency in the amounts of the verdict in relation to the evidence presented on Union Pacific's theories under FELA, will be addressed later, and only briefly, due to our findings regarding the plaintiff's closing argument, as presented below.

¶ 61        B. Motion for New Trial Based on the Plaintiff's Closing Argument

¶ 62    Union Pacific argues that the plaintiff's closing argument was prejudicial and the trial court's denial of its motion for a new trial was in error. We review the trial court's ruling on a motion for new trial and consider the "prejudicial impact of improper comments made during closing argument, including violations of *in limine* orders," with considerable deference and reverse the rulings only if the court abused its discretion. *Sikora v. Parikh*, 2018 IL App (1st) 172473, ¶ 57. An abuse of discretion is found where the court misapplies the law (*Carlson v. Jerousek*, 2016 IL App (2d) 151248, ¶ 69), "when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." (Internal quotation marks omitted.) *Palacios v. Mlot*, 2013 IL App (1st) 121416, ¶ 18.

¶ 63    The purpose of closing argument "is to draw reasonable inferences from the evidence and to assist the jury in fairly arriving at a verdict based on the law and the evidence." *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 948 (2000). Generally, counsel is afforded wide

25

latitude during closing argument; they may "comment and argue on the evidence and any inference that may be fairly drawn from that evidence." *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008). "The scope of closing argument is within the sound discretion of the trial court and the reviewing court will reverse only if the argument is prejudicial." (Internal quotation marks omitted.) *O'Neil v. Continental Bank, N.A.*, 278 Ill. App. 3d 327, 340 (1996).

¶ 64    Here, prior to the hearing, Union Pacific presented a motion *in limine* prohibiting the plaintiff from presenting "[a]ny argument, comment, or suggestion that the jurors act as safety advocates in this lawsuit or that they send a message to the corporate defendant with their verdict on the grounds that such argument is improper and inflammatory." The motion was granted by the trial court. As such, in addition to limiting closing argument to the evidence or any reasonable inferences that may be fairly drawn from the evidence, the parties were also required to ensure that the plaintiff's closing argument did not offend the trial court's order granting the motion *in limine*.

¶ 65    Typically, the trial court rightly exercises restraint in taking any action *sua sponte* and the counsel for the other side must object to the offensive statements. *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶¶ 202, 212. "When the trial court sustains an opposing party's objection, that is not a judicial action to be complied with only if the offending counsel agrees with the ruling." *Id.* ¶ 211. "[I]n a situation where a party continues with *** [an] argument after an objection has been sustained, a trial court can and likely should intervene, particularly *** when counsel's disregard of the court's ruling is so flagrant and repetitious." *Id.* ¶ 212 "After all, it is the *trial court's* authority and control of the proceedings that the offending counsel has chosen to disregard." (Emphasis in original.) *Id*.

¶ 66    Here, after complimenting the jury on its service, the plaintiff's counsel stated, "Make no mistake. This case is about more than one man getting hurt at work. You have an opportunity to

26

do more for the safety of your community than you will likely ever again in the rest of your lives." Union Pacific objected, and the trial court admonished the jurors that any statement made by an attorney that was not based on the evidence should be disregarded, and they should use their own recollection of the evidence. The trial court again reminded the jury that what the attorneys said during arguments was not evidence.

¶ 67 The plaintiff's counsel next stated, "The very first words out of my mouth at the beginning of the trial were numbers. 2.8 million workplace injuries in 2018." Union Pacific objected, stating that was "not presented during the trial by any witness." The parties were asked to approach the bench and the court stated, "Okay. Here's the situation. These are closing arguments. I can give the cautionary instruction, as I have. I mean, they're to use their own recollection based upon the evidence, what they heard. What are you—what are you objecting to?" Defense counsel stated, "There was no witness that said there was 2.8 million work-related injuries last year, what he just said. There's no evidence of that." The trial court sustained the objection and told the plaintiff's counsel to continue.

¶ 68 The plaintiff counsel continued, "The simple truth is, some employers don't take *** safety seriously. Union Pacific is one of those employers." Union Pacific again objected, and the trial court sustained the objection.

¶ 69 After the objection was sustained, the plaintiff's counsel told the jury that safety rules "protect us all. You have the power to make this community safer." Further comments included: (1) "[y]ou have the power to make sure the safety rules that protect people at work are enforced"; (2) "safety rules will protect people if—if jurors choose to enforce them"; (3) "[t]his is your community"; and (4) "If this happens again in the future to somebody else, do you know what?

27

They're going to be in a courtroom a lot like this, and they're going to be sitting up there. And the railroad's going to have a witness come in and say, 'we searched the records.' "

¶ 70    Following another sustained objection, the plaintiff's counsel continued, stating, "As we all know, conduct rewarded is conduct repeated. If you don't do something about it today, it's going to happen again." The plaintiff's attorney further enforced the jurors' position as "safety advocates," stating,

> "And if they don't care about the safety rules you heard about in this case, what other safety rules are they ignoring? Who else are they putting at risk? *** What other rules are going unenforced, that are putting people at danger. If the railroad isn't going to enforce its safety rules, that burden falls to you."

¶ 71    After addressing the evidence and the credibility of the railroad's witnesses, the plaintiff's attorney stated he had 11 reasons why the jury could award $5 million to the plaintiff and his family, stating, "1. Safety rules will be enforced. Union Pacific will be safer; every place of employment will be safer. Keep in mind, your verdict today isn't just about this case. Your verdict will set a precedent. Your verdict today will be looked at in the future to say—" Another objection was made and sustained.

¶ 72    Thereafter, the plaintiff's counsel stated, "Your verdict will stand for the proposition that this community demands safety rules be enforced. 2. Union Pacific will follow its own rules. It won't let people do what Glen Elliot did. It won't try to justify conduct like you heard about." Another objection was made and sustained.

¶ 73    The plaintiff's attorney then stated, "3. The railroad will stop trying to cover up when people get hurt at work. Will stop trying to cover up when their managers—" Another objection was made—this time overruled. The plaintiff's counsel continued by stating, "when their

28

managers hurt others. Glen Elliot and other supervisors will realize his conduct, it's not going to be tolerated in this community. If somebody gets hurt, this community will stand with the person that was hurt." The plaintiff's attorney completed his list, providing reason No. 11, stating, "It symbolizes who we are as a community. It symbolizes what we stand for. If somebody gets hurt at work, especially in a situation like this, this community stands with that person. This community will make sure that person does not want because of what happened to them."

¶ 74   After addressing the verdict forms, the plaintiff's attorney stated:

"Glen Elliot was the start of all this. He—he is responsible for the unwanted physical contact. He shouldn't be excused for what he did.

But the majority of what's going on here is the culture created by the railroad that allows this to happen and does nothing about it. The responsibility for what happened to John lays directly at the feet of Union Pacific Railroad.

Now, if you want to live in a community where employers don't enforce their safety rules, your verdict should be for the railroad and for Glen Elliot.

And if you want to live in a community where employers refuse to protect employees from unwanted physical contact, your verdict should be for the railroad and Glen Elliot.

If you want to live in a community where employers hurt people, and then try to avoid responsibility, absolutely return a verdict for the railroad and Glen Elliot.

If you want to live in a community where employers don't take responsibility for their actions and the actions of their employees, or try to cover them up, your verdict should be for the railroad and Glen Elliot.

29

If that's not the community you want to live in, though, if that's not good

enough for this community, then your verdict should be for John.

And as I said to you at the very beginning of this case, ladies and gentlemen,

you have a power to make a difference here in this case.

And conduct rewarded is conduct repeated."

¶ 75 As soon as the plaintiff's attorney completed his closing argument, the judge called both parties to the bench to address the length of time for closing argument. Immediately after, defense counsel moved for a mistrial on the entirety of the plaintiff's closing argument, stating the plaintiff's argument did not discuss the evidence or the law but appealed to the jury to punish the railroad and send a message to the railroad. The plaintiff's counsel responded by saying, "I—I never said, 'send a message.' I never asked for punitive damages. I never did anything to suggest punitive damages or punishment. I argued deterrence which is allowed by the Illinois Supreme Court." The court denied the railroad's motion.

¶ 76 On appeal, Union Pacific contends that the plaintiff's closing argument was intended to inflame the jury's passions, claiming the railroad presented a danger to the community and must be stopped to keep the community safe. It further contends that the plaintiff's closing argument was a request for a moral or social judgment, did not stick to the evidence submitted or any inferences that could be drawn therefrom, and violated the order granting Union Pacific's motion *in limine*.

¶ 77 In response, the plaintiff contends that Union Pacific failed to object to all the statements claimed in its appellate court brief and the railroad received curative instructions from the trial court to the ones properly objected to before the trial court. The plaintiff also contends that the trial court's order granting the motion *in limine* was not in writing so there was confusion as to

30

what the order meant and stated that, even if Union Pacific had objected, the plaintiff's closing statements were similar to ones previously allowed in other cases and, therefore, Union Pacific "had to live with the consequences."

¶ 78    Here, there is no dispute that Union Pacific's brief noted portions of the plaintiff's closing argument to which no objection was made during trial. "Generally, the failure to object to alleged errors in an opponent's closing argument is considered a waiver of objection." *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 585 (1993). Here, we do not find that Union Pacific waived the issue when it objected numerous times during closing argument, immediately requested a mistrial based on the plaintiff's "entire closing argument" following the completion of the plaintiff's argument, and continued to raise the issue in its posthearing brief. However, even if Union Pacific waived the issue, "the waiver rule is a limitation on the parties to an appeal, not on the reviewing court [citation], and may be ignored in order to achieve a just result [citation]." *Id*. "Accordingly, despite the absence of objection, a reviewing court may consider claims of improper statements during closing argument to the extent such statements prevented a fair trial." *Id*.

¶ 79    We also agree that, typically, once a "trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures the prejudice." *Willaby v. Bendersky*, 383 Ill. App. 3d 853, 862 (2008). "However, sustaining the objection might be insufficient to cure the prejudice in certain instances, such as when the comment was repeated or made in violation of prior court orders, including orders on motions *in limine*." *Konewko v. Advocate Health & Hospitals Corp.*, 2020 IL App (2d) 190684, ¶ 83 (citing *Pleasance v. City of Chicago*, 396 Ill. App. 3d 821, 828-29 (2009)); see *Lenz v. Julian*, 276 Ill. App. 3d 66, 74-75 (1995).

¶ 80     In this case, the plaintiff's blatant disregard of both the sustained objections and order that granted Union Pacific's motion *in limine* cannot be ignored. Contrary to the plaintiff's assertion, the motion *in limine* was not confusing. It specifically prohibited the plaintiff from "[a]ny argument, comment, or suggestion that the jurors act as safety advocates in this lawsuit or that they send a message to the corporate defendant with their verdict." Despite the trial court's order granting this motion, the plaintiff repeatedly and unabashedly—even after the objections had been sustained—continued to use language that was consistent with making the jury "safety advocates" for their community and "sending a message" to Union Pacific.

¶ 81     "Violation of a motion *in limine* is not *per se* reversible error." *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 395 (2000). However, "[a]n improper insinuation during closing argument that violates an *in limine* order can be the basis for a new trial." *Boren v. The BOC Group, Inc.*, 385 Ill. App. 3d 248, 257 (2008). Improper comments during closing argument are not reversible error unless substantial prejudice is shown. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1065 (2001). Therefore, to determine prejudice, the "[c]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Caffey*, 205 Ill. 2d 52, 131 (2001) (citing *People v. Macri*, 185 Ill. 2d 1, 62 (1998)).

¶ 82     Although not directly on point, *Konewko*, 2020 IL App (2d) 190684, is instructive in its review of improper closing statements. See *id.* ¶¶ 86-106 (addressing *Rush v. Hamdy*, 255 Ill. App. 3d 352 (1993), *Torrez v. Raag*, 43 Ill. App. 3d 779 (1976), and *Kass v. Resurrection Medical Center*, 316 Ill. App. 3d 1108 (2000)). "In considering the propriety of the closing argument," "[w]orse still is when an improper argument not only appeals to the jury's sympathy but also injects an improper element into the case." *Id*. ¶ 80. "This makes it more likely that the jury's verdict was influenced by the improper comment." *Id*.

¶ 83    In *Rush*, 255 Ill. App. 3d 352, two statements during closing argument were deemed improper. *Id.* at 358-59. In *Torrez*, 43 Ill. App. 3d 779, one improper statement was started but was not completed due to the objection, which was sustained by the court. *Id.* at 783. Here, the plaintiff's offensive arguments were often repeated and continued even after the trial court sustained the objection. While there is no dispute that the plaintiff's closing argument did not use the words "safety advocate" or "send a message," the tenor of the plaintiff's closing argument was based on a theme incorporating both messages in direct contravention of the trial court's order *in limine*. Considering the entirety of the plaintiff's closing argument, as well as its refusal to abide by the trial court's sustained objections and order *in limine*, we find the cumulative effect of counsel's prejudicial comments deprived the defendants of a fair trial.

¶ 84    Evidence supporting this conclusion is seen in jury verdicts. Error is not removed by sustaining an objection if it reasonably appears that an improper argument influenced the verdict. *Lewis v. Cotton Belt Route–St. Louis Southwestern Ry. Co.*, 217 Ill. App. 3d 94, 123 (1991); see *People v. Garreau*, 27 Ill. 2d 388, 391-92 (1963). "Reversal is warranted *** where the verdict resulted from the passion or prejudice of the jury rather than from an objective consideration of the evidence" or "when the evidence is close, such that a jury might reasonably return a verdict for either party." *Konewko*, 2020 IL App (2d) 190684, ¶ 84.

¶ 85    Here, one verdict was against Union Pacific and awarded damages to the plaintiff totaling $3.14 million. The second verdict against Elliot, the party who performed the alleged acts of misconduct, awarded the plaintiff damages in the amount of $10,000 for the emotional distress experienced and reasonably certain to be experienced in the future. We find Union Pacific's point is well taken that this represents a potentially inconsistent verdict and is evidence that the jury was influenced by the improper closing argument. We find that no reasonable judge could conclude

33

that the plaintiff's improper closing argument did not prejudice this verdict. The plaintiff's counsel repeatedly instructed the jury to act as safety advocates in violation of the circuit court's order *in limine.* As such, we find the circuit court abused its discretion when it denied Union Pacific's motion for a new trial.

¶ 86                     C. Direct Liability and Notice

¶ 87    As noted above, Union Pacific's judgment *n.o.v*. argument addressing plaintiff's direct liability theories was precluded by Union Pacific's failure to address plaintiff's vicarious liability theories which left potential liability on the part of the railroad under FELA. However, because the issue Union Pacific raises regarding direct liability and notice is likely to recur on remand, we briefly address the argument.

¶ 88    For direct FELA claims about unsafe work conditions, "an essential element of a Federal Employers' Liability Act claim is foreseeability, or whether there were ' "circumstances which a reasonable person would foresee as creating a potential for harm." ' " *LeDure v. Union Pacific R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020) (quoting *Holbrook v. Norfolk Southern Ry. Co*., 414 F.3d 739, 742 (7th Cir. 2005), quoting *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 300 (7th Cir. 1996)). Reasonable foreseeability of harm refers to whether the railroad had actual or constructive notice that a potential hazard exists. *Brzinski v. Northeast Illinois Regional Commuter R.R. Corp*., 384 Ill. App. 3d 202, 205 (2008) (citing *Holbrook*, 414 F.3d at 742, and *Williams v. National R.R. Passenger Corp.*, 161 F.3d 1059, 1063 (7th Cir. 1998)).

¶ 89    "Constructive notice may be proven by demonstrating that a condition existed for an extended period of time and the defendant could therefore have discovered the condition 'through the exercise of reasonable care.' " *Heider v. DJG Pizza, Inc.*, 2019 IL App (1st) 181173, ¶ 34 (quoting *Lombardo v. Reliance Elevator Co*., 315 Ill. App. 3d 111, 120 (2000)). Constructive

34

notice is also shown where the defendant has notice of facts that would cause a reasonable person to inquire further into the facts. *Pinto v. DeMunnick*, 168 Ill. App. 3d 771, 774 (1988).

¶ 90    Here, the plaintiff presented two direct liability theories. Regarding the first theory, the plaintiff was required to demonstrate that the railroad knew, or should have known, prior to the attacks, that it failed to have an effective system (through rules, training, discipline, or otherwise) in place to protect the plaintiff or its other employees from unwanted physical contact. Under the facts adduced at trial, we find this burden cannot be met where the plaintiff intentionally chose not to avail himself of the numerous methods provided by Union Pacific to report Elliot's conduct until after the fourth incident. Nor can the burden be met thereafter where the uncontested evidence revealed that once the fourth incident was reported, Union Pacific took action to protect the plaintiff from unwanted physical contact which, by the plaintiff's own testimony, was successful. The plaintiff's testimony confirmed that no unwanted physical contact occurred after the plaintiff reported Elliot's conduct to Union Pacific. As such, we find nothing in this record supports a finding of either actual or constructive notice to Union Pacific for this claim prior to the fourth incident, which was the last incident of "unwanted physical contact."

¶ 91    To succeed on the plaintiff's second direct liability theory, which was based on Union Pacific's alleged negligent retention of Elliot, the plaintiff was required to demonstrate that the railroad "knew or should have known prior to the assault of propensities of the assailant to commit such assaults." *Harrison v. Missouri Pacific R.R. Co.*, 372 U.S. 248, 249 (1963). "A railroad has no liability for an assault by one employee upon another in the absence of notice of the assaulter's 'vicious propensities' ***." *Green v. River Terminal Ry. Co.*, 763 F.2d 805, 808-09 (6th Cir. 1985).

35

¶ 92    While the plaintiff's testimony of four altercations with Elliot is sufficient to show Elliot's propensity, the record is devoid of any evidence that Union Pacific knew, or should have known, of Elliot's propensity until after the fourth incident. As such, we find nothing in this record supports a finding of either actual or constructive notice to Union Pacific prior to the fourth incident, which was the last incident of "unwanted physical contact." Here, due to the plaintiff's improper closing argument and potentially compromised verdict, it is impossible to tell whether the jury's verdict was based, in whole, or in part, on the plaintiff's direct liability theories under FELA. Nevertheless, we find, based on the record of this trial, that any verdict in favor of the plaintiff on its direct liability theories under FELA would be against the manifest weight of the evidence. As such, on retrial, if no further evidence in this regard is presented, it may be proper to preclude the direct liability theories from being presented to the jury.

¶ 93                                III. CONCLUSION

¶ 94    For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby reversed, and this cause is remanded for a new trial.

¶ 95    Reversed and remanded.

¶ 96    JUSTICE WELCH, dissenting:

¶ 97    I respectfully disagree with the majority's decision to reverse and remand the judgment entered on the jury's verdicts for the following reasons.

¶ 98    The defendants, Union Pacific Railroad Company (Union) and Glen Elliot (Elliot), appeal from a judgment entered by the circuit court of St. Clair County on October 13, 2020, following jury verdicts in favor of the plaintiff, John McCarthy, in an action for damages under the Federal Employers' Liability Act (FELA) (45 U.S.C. §§ 51-60 (2012)) and common law negligence,

36

respectively. In finding in favor of the plaintiff, the jury awarded $3.14 million in damages against Union and $10,000 in damages against Elliot.

¶ 99 First, regarding the plaintiff's counsel's closing argument, the statements made by counsel during closing argument do not rise to the level requiring reversal, especially where any prejudicial effect was cured by the trial court's numerous sustained objections and multiple admonishments to the jury.

¶ 100 During the plaintiff's counsel's argument, the defendant was granted all requested remedies, save for one overruled objection. Additionally, each amount awarded to the plaintiff was clearly accounted for on the jury forms and was $1.2 million less than what the plaintiff was seeking. The highest categorized amount awarded to the plaintiff was for compensation of lost wages. This is important to note because the plaintiff was 30 years old, was unable to work, and was previously earning $82,000 per year when he was employed by Union. There were also outstanding medical bills that the plaintiff submitted to establish those costs. Nothing about the jury's verdicts, neither the total amount nor the individual amounts provided on the verdict form, indicates that the jury was influenced by the statements made by the plaintiff's counsel during closing argument. Considering the remedies provided by the trial court, the amount of the damages, and the itemization of the award on the verdict form, I would affirm the court's denial of the defendants' motion for new trial.

¶ 101 The second issue is whether the court should have granted the defendants' motion for new trial where the jury's verdicts were irreconcilably inconsistent. The court was correct in denying the motion and, as the majority focuses its analysis on the facts presented at trial, its conclusion is predicated on considerations outside the purview of our limited scope on review. Nothing in the

parties' appellate briefs or the majority's opinion points to a legal inconsistency under existing law.

¶ 102   It is well settled that in an action "where verdicts are returned which are legally inconsistent with each other, the verdicts should be set aside and a new trial granted." *Wottowa Insurance Agency, Inc. v. Bock*, 104 Ill. 2d 311, 316 (1984). Verdicts are legally inconsistent where the same element is found to both exist and not exist, *i.e.*, when an element of the second claim requires proof of the first claim. *Redmond v. Socha*, 216 Ill. 2d 622, 649 (2005); see *Bock*, 104 Ill. 2d 311. Whether two verdicts are legally inconsistent is a question of law reviewed *de novo*. *Redmond*, 216 Ill. 2d at 642. A court will exercise all reasonable presumptions in favor of the verdicts not being found legally inconsistent unless absolutely irreconcilable, and the verdicts will not be considered irreconcilably inconsistent if supported by any reasonable hypothesis. *Id*. at 643-44. As noted in *Redmond*, there is no authority for the proposition that a verdict or verdicts in a civil case must be without any conceivable flaw in logic, only that they must be *legally* consistent. *Id*. at 650. Here, as in *Redmond*, the jury's verdicts were not legally inconsistent because the jury did not find some essential matter proven in one claim but not proven in the other. Instead, the jury, after considering all the evidence, found both defendants liable for the harm caused to the plaintiff because of their negligence. Elliot was found liable under common law negligence, and Union was found liable for negligence as proscribed in FELA. Any argument regarding the sufficiency of the evidence is inconsequential to an analysis of whether there is a legal inconsistency under the law. Therefore, because the necessary elements of both claims can be proven without contrary findings, and neither claim requires proof of the other as a necessary element, I would affirm the judgments entered by the trial court on the jury's verdicts, including the damages assessed against each defendant.

**No. 5-20-0377**

| | |
|---|---|
| **Cite as:** | *McCarthy v. Union Pacific R.R. Co.*, 2022 IL App (5th) 200377 |
| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, No. 17-L-67; the Hon. Heinz M. Rudolf, Judge, presiding. |
| **Attorneys for Appellant:** | Jonathan B. Amarilio, James T. Eaton, of Taft Stettinius & Hollister LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Charles W. Armbruster, III, Michael T. Blotevogel, Roy C. Dripps, III, of Armbruster, Dripps, Winterscheidt & Blotevogel, LLC, of Maryville, Shaun M. Lieser, Lieser Law Firm, LLC, of St. Louis, MO, for appellee. |